ROSA BARBER v. HARTFORD LIFE INSURANCE COMPANY, Appellant.

Division One, July 3, 1916.*

1. **CONSTITUTIONAL LAW:** Insurance: Vexatious Delay: Attorney's Fee. The provision in section 7068, Revised Statutes 1909, authorizing the imposition of damages and attorney's fees for vexatious delay in paying an insurance policy, is not violative of section 10 of article 1 of the Constitution of the United States, or of section 1 of the Fourteenth Amendment, or of sections 10 or 30 of article 2 of the Constitution of Missouri.

---

*NOTE.—Opinion filed March 30, 1916. Motions for rehearing and to transfer to Court in Banc overruled July 3, 1916. Certified to Reporter January 18, 1917.

Barber v. Insurance Co.

2. FORMER ADJUDICATION: Objection to Pleading. Objection that the judgment of a court of another State set up as an adjudication of the matter in controversy, is not well pleaded, ought to be directed against the answer before trial; and, although it would probably have been available if timely made, should not be allowed, if its allowance would, during the progress of the trial, force an amendment of an answer which by reasonable construction raises the constitutional point which it asserts as a defense.

3. INSURANCE: Forfeiture: Failure to Pay Assessment. An insurance company which refuses to pay a policy after the insured's death because he had failed to pay an assessment against him, must show that there was such an assessment, and that it was a liability which he had by his contract bound himself to pay. And the burden is on the company to show a performance on its part as strict and literal as the performance it seeks to exact from him. Unless the assessment is shown to have been made in accordance with the contract, his widow cannot be deprived of the indemnity because of his failure to pay the assessment.

4. ———: ———: ———: Application of Assessments. Where an insurance company has accumulated a large fund, the interest on and further accretions to which were to be distributed among certificate-holders in proportion to the amount of insurance held by each, by applying it in reduction of their future assessments, an assessment which fails to credit the amount so applicable is excessive, and an attempt to forfeit a policy for failure to pay it is invalid.

5. ———: ———: ———: Excessive. A grossly excessive assessment, made without contractual authority and in pursuance to a policy of accumulating large funds at the expense of the certificate-holders and withholding them from distribution, is invalid.

6. ———: ———: ———: Former Adjudiction. A former adjudication by a court of general jurisdiction in the State of the Company's incorporation, for a policy holder and all others similarly situated, that it was proper that margins of excessive assessments might accumulate into a mortuary fund, to be used in the payment of death losses in advance of assessments, to an amount limited in the judgment, was not an adjudication that a further excessive assessment would be valid, when the company had on hand, applicable to mortuary claims, at the time the assessments were made, a mortuary fund far in excess of such amount.

7. ———: ———: ———: Replenishment Fund. An assessment made for the replenishment of such fund in an amount grossly in excess of the amount so adjudicated and not required to pay losses accrued, is void.

8. ———: ———: Payment of Dues. Where by the terms of the policy certain dues were payable annually on October 1st of each year, the company cannot make one-fourth of the amount due for

the quarter between March 1st and June 1st and forfeit his policy for failure to pay that fourth before June 1st.

9. ———: ———: **Assessment Without Authority from Directors.** The levying of assessments and the determination of the amount of a mortuary fund to be kept on hand for the payment of death losses as they occur without waiting for an assessment, are the highest and most important acts devolved upon an assessment insurance company; and where its charter declares that "all the affairs of said corporation shall be managed and controlled by a board of not less than seven directors," the executive officers are without authority to levy assessments and determine the amount of the accumulated mortuary fund otherwise than under its direction to be shown by its records.

10. ———: **Vexatious Delay.** The whole question of vexatinous refusal or delay to pay an insurance policy is a matter of fact to be determined by the jury.

Appeal from Johnson Circuit Court.—*Hon. C. A. Calvird*, Judge.

AFFIRMED.

*Jones, Hocker, Hawes & Angert, J. W. Suddath & Son*, and *James C. Jones, Jr.*, for appellant.

(1) The Connecticut court was a court of competent jurisdiction to determine the question of the right of the company to maintain the mortuary fund and its decree was binding upon the company and all its members. Ins. Co. v. Ibs, 237 U. S. 662; Royal Arcanum v. Green, 237 U. S. 531; Condon v. Mutual Reserve, 89 Md. 99; Clark v. Mutual Reserve, 14 App. D. C. 154; Taylor v. Mutual Reserve, 97 Va. 60; State ex rel. v. Shain, 254 Mo. 78. (2) The issue as to the right and propriety of maintaining the mortuary fund was involved in the Connecticut case and in the case at bar. Ins. Co. v. Ibs, 237 U. S. 662; Southern Pacific Co. v. U. S., 168 U. S. 1; Klein v. Ins. Co., 104 U. S. 88. (3) The court below did not give full faith and credit to the judicial proceedings in Connecticut and refused to give any effect whatever to the decree of the Connecticut court, contrary to the command of the Federal Constitution. Ins. Co. v. Ibs, 237 U. S. 662; Royal Arcanum v. Green, 237 U. S. 531; Notions v. Johnson, 24 How. 195; Huntington v. Attrill, 146 U. S. 657; Ins. Co. v. Harris, 97 U. S. 381; Harris

v. Balk, 198 U. S. 215; Selig v. Hamilton, 234 U. S. 652. (4) The plaintiff in this case stood as to the Dresser case in privity with her husband, and he was by representation a party to the Dresser case, and is bound by the decree in that case. Ins. Co. v. Ibs, 237 U. S. 662; Wallace v. Adams, 204 U. S. 415; 2 Perry on Trusts, sec. 885; 2 Beach on Trusts, sec. 498; Scott v. McDonald, 165 U. S. 116. (5) It was error to instruct the jury that it was incumbent upon the board of directors to levy this assessment. Fee v. National Assn., 110 Iowa, 271; Ins. Co. v. Birnbaum, 116 Pa. St. 565; Niblack on Benefit Societies, sec. 280; 2 Cooley's Briefs on Insurance, p. 1027.

*Nick M. Bradley, Robert Kelley* and *Charles E. Morrow* for respondent.

(1) Assessment 126 is void because not made by the directors. (a) The charter places the management of the affairs of the corporation in the board of directors. The directors at no time delegated this important power to its ministerial officers, and the alleged assessment made by the president and secretary is void. (b) If the assessment calls for the exercise of discretion on the part of the directors it cannot be delegated. Ins. Co. v. Chase, 56 N. H. 341; Bacon on Benefit Societies, sec. 377; 10 Cyc. 770, 906-910. (c) The burden is on defendant to show the assessment was made by proper authority. No presumption exists in its favor. Niblack on Benefit Soc., sec. 252. It is incompetent to show that it was a custom of the president and secretary to make assessments without authority, unless it further appears that Frank Barber had knowledge of the custom. No such knowledge is shown. Niblack on Benefit Soc., sec. 252; Underwood v. Legion of Honor, 66 Iowa, 134. (d) A corporation must speak through its record, and the proof that assessment 126 was made can only be shown by the record. In this case the testimony showed no record was made or kept of the alleged assessment and it cannot be proved by parol. Hannum v. Waddill, 135 Mo. 162. (2) Burden is on defendant to

show the assessment was necessary, not excessive and legally made. No presumption of right acting in the levying will be entertained. Hannum v. Waddill, 135 Mo. 153; Earney v. Modern Woodman, 79 Mo. App. 385; Agnew v. A. O. U. W., 17 Mo. App. 254; Puschman v. Ins. Co., 92 Mo. App. 640; Johnson v. Ins. Co., 166 Mo. App. 275; King v. Ins. Co., 133 Mo. App. 612; Wayland v. Indemnity Co., 166 Mo. App. 221; Settle v. Ins. Co., 150 Mo. App. 520; Ibs v. Ins. Co., 121 Minn. 310. A policy-holder in an assessment company cannot be subjected to a forfeiture until he refuses to pay a lawful demand. If the assessment in question was illegal for any reason, the defendant is without legal reason in refusing to pay the loss. Johnson v. Ins. Co., 166 Mo. App. 275; Craig v. Ins. Co., 136 Mo. App. 5; Settle v. Ins. Assn., 150 Mo. App. 529. (3) If the assessment in question was excessive after making reasonable allowance for lapses and failure to make collections, that is, if the amount actually assessed exceeds materially the amount required to meet death claims, it was illegal and void, and the refusal to pay the same will not work a forfeiture. King v. Ins. Co., 133 Mo. App. 620; Johnson v. Ins. Co., 166 Mo. App. 261; Ibs. v. Ins. Co., 121 Minn. 310. (4) The right to assess must be strictly construed and it can be exercised only when the conditions prescribed in the contract of insurance exist. Wayland v. Indemnity Co., 166 Mo. App. 221; Ins. Co. v. Giese, 49 Mo. 239; 2 Joyce on Insurance, sec. 1310; Craig v. Ins. Co., 136 Mo. App. 10. "Forfeitures are not favored in the law, and before the courts will declare one it is essential for the party insisting upon it to show strict compliance with every term said to afford the basis for thus summarily divesting the right." Settle v. Insurance Assn., 150 Mo. App. 527. (5) The policy does not authorize assessments for future losses. Unless the Dresser decree should have been admitted in evidence, and unless this court is bound by that decree, the policy sued upon does not authorize the levy of an assessment for losses which may be anticipated to occur in the future. And in the absence of such authority, an assess-

ment made for that purpose is void. Under all the authorities, an assessment made to pay death losses which have in fact been paid is void. Ibs v. Ins. Co., 121 Minn. 310; Johnson v. Ins. Co., 166 Mo. App. 261; King v. Ins. Co., 133 Mo. App. 612. (6) The validity of the assessment must be determined by the condition upon the date made. Death losses not then considered or mentioned in the notice cannot be considered. Ibs v. Ins. Co., 121 Minn. 313; 23 Cyc. 1527. The plea nowhere alleges that the court rendering the judgment had jurisdiction either of the parties or the subject-matter. This must be alleged. State to use v. Brooke, 29 Mo. App. 289. (7) *Res adjudicata* must be specially pleaded. Frauerman v. Lippincott, 39 Mo. App. 478; 23 Cyc. 1523. (8) The defendant did not offer the whole record in the Dresser case, but simply what purports to be the final judgment. It did not contain the pleadings so that the real issues could be determined. The court did not commit error in refusing it. The entire record must be offered. Crone v. Dawson, 19 Mo. App. 214; Williams v. Williams, 53 Mo. App. 623; 23 Cyc. 1568. It does not show particular matter in issue. "In order to constitute a former adjudication it must affirmatively appear that the matter in dispute was put in issue and tried." Drainage Dist. v. Turney, 235 Mo. 94; Turnverein v. Hagerman, 232 Mo. 703; Pierce v. Pierce, 139 Mo. App. 419; Dickey v. Henri, 48 Mo. App. 120; 23 Cyc. 1536-37. The Dresser judgment sought to be enforced against the plaintiff was not rendered until March 23, 1910, after the alleged forfeiture had taken place. Ordinarily as to the rights of parties to an action, a judgment takes effect upon them as they exist at the time of its rendition, and not as they existed at the commencement of the suit or before that time. This judgment ought not to be given a retroactive effect so as to bind this plaintiff by relation before it was rendered. 23 Cyc. 1106; Bacon v. Kimmel, 14 Mich. 201; Johnson County v. Hart, 3 Wyo. 563. (9) Sec. 7068, R. S. 1909, authorizing the assessment of ten per cent damages and attorney's fees for vexatious delay in paying policy

of life insurance is constitutional.   Keller v. Ins. Co., 198 Mo. 440; Farmer Ins. Co. v. Dobney, 189 U. S. 301; Fraternal Mystic Circle v. Snyder, 227 U. S. 497.

BROWN, C.—This is an action at law on policy number 174,416 issued by the defendant September 4, 1893, insuring the life of Frank Barber for $2000 for the benefit of the plaintiff, who was then his wife and is now his widow, and for damages for vexatious refusal to pay the loss under the provisions of section 7068, Revised Statutes 1909.   Mr. Barber died June 5, 1910. There was a judgment in the circuit court for $2976, including $200 damages and $500 attorney's fee awarded by the jury for vexatious refusal to pay, from which this appeal is taken.   The defendant is a life insurance company of Connecticut.   It had a business department called the "Safety Fund Department," which was again divided into the "Men's Division" and "Women's Division," which issued policies payable on the assessment plan, and this policy was of course in the 'Men's Division," and was called a "Certificate of Membership Safety Fund Department."

The answer pleads that this certificate was conditioned upon the payment of periodical assessments; that on January 29, 1910, an assessment designated as "Call 126" was levied on it against Barber for $13, with dues amounting to $1.50, which became due by the terms of the certificate on March 1, 1910; that Mr. Barber failed to pay it on or before March 20th, to which time it had been extended; and in consequence thereof the insurance was, by the terms of the certificate, forfeited.   The issues in the case grow out of this circumstance.   It also pleads, in effect, that an action had been brought in the New Haven County Superior Court of Connecticut, by one Dresser, holding a similar certificate of membership in the safety fund department of defendant, on his own behalf, as well as on behalf of all others similarly situated, including the plaintiff, wherein the rights of plaintiff were fully adjudicated; that the mortuary fund of said department and the trust thereby created is being

administered strictly in accordance with the terms of said certificate and trust as construed and adjudicated by said court, whereby defendant is without authority to pay out of said mortuary fund the amount of any certificate of membership where, as in this case, the member has failed or refused to pay the assessment levied against him to maintain said fund. It also denied the right of plaintiff to recover the damages and attorney's fee sued for, because the provisions of said section 7068 authorizing the imposition of such damages and attorney's fee are unconstitutional· and void as being in violation of section 10 of article 1 of the Constitution of the United States, and of section 1 of the Fourteenth Amendment thereto, and of section 30 of article 2, and of section 10 of article 2, of the Constitution of Missouri; and because the construction thereof by the courts of this State constitutes a rule of judicial construction violative of said provisions of the State and Federal constitutions, and because said section 7068, if applied to this case, and in its application to the facts of this case, denies the defendant due process of law as guaranteed. by the State and Federal constitutions. These matters were all put in issue by replication.

The defendant on the trial offered in evidence the record in the Dresser case duly certified under the act of Congress in such cases made and provided, which was, on plaintiff's objection, excluded, to which defendant duly excepted.

The policy sued on, so far as applicable to the questions in this case, is as follows:

"In consideration of the representations, agreements, and warranties made in the application herefor, and of the admission fee paid; and of $3 per annum on each $1000 of the indemnity herein provided for, for expense dues, to be paid as hereinafter conditioned, and of the further payment of all mortality calls proportioned to the said indemnity, levied against the herein-named member to form a mortuary fund for the payment of all indemnity matured by deaths of members, and to create a safety fund as hereinafter described, which mortality calls, to be levied upon all the members in the department wherein this certificate is issued whose certificates are in force at the date of such deaths, shall be made according to the table of graduated mortality ratios given hereon, and as further determined by their respective ages

and the aggregate indemnity of the dates of such deaths, with due allowance for discontinuance of membership (one-third of the proceeds of such mortality calls to be applied toward said safety fund until the sum of $10 on each $1000 indemnity aforesaid shall have been thus applied, when the basis of all subsequent mortality calls shall be two-thirds only of the table given hereon) does hereby issue this certificate of membership in its safety fund department to Frank Barber (herein called the member) of *St. Louis* County, of *city of St. Louis*, State of *Missouri*, with the following agreements:

"That ninety days from the receipt by the president or secretary of said company of satisfactory proofs, in accordance with forms furnished upon notice of death and with full information as to the manner and cause of the death of the herein-named member while this certificate is in force, all the conditions hereof having been conformed to by the member, upon presentation and surrender of this certificate properly receipted, there shall be due and payable, out of the aforesaid mortuary fund and not otherwise, the indemnity of $2000 (less the balance unpaid, if any, of the stipulated contribution to said safety fund, with fifty per cent added, together with the unpaid installments of annual expense dues and any mortality or other charge against the member payment of which is not matured), to his wife, Rosa Barber, if living, otherwise to his legal representatives. All such payments to be made at the home office of said company in lawful money of the United States.

"That said company will deposit said sum of $10, when received, with the trustee, named in a contract with it (of which a copy is printed hereon), as a safety fund in trust for the uses and purposes expressed in said contract; and shall make a semiannual division of the net interest received therefrom by it pro rata among all the holders of certificates in force in said department at such times, who shall have contributed five years prior to the date of any such division their stipulated proportion of said fund, by applying the same to the payment of their future dues and assessments; and that, whenever said fund shall amount to $1,000,000, all subsequent receipts therefor shall be divided by the said company in like manner as the interest."

The department in which this certificate was issued was organized about 1879, on the following plan: Each person applying for insurance under the plan was to pay an admission fee of $8 for $1000; $12 for $2000; $15 for $3000; $18 for $4000; $20 for $5000; $40 for $10000, and the medical examination fee estimated at $3 to be paid to the physician; also to pay annually for the sole purpose of paying all expenses of said insurance $3 for each $1000 of insurance; and also to pay, as mortuary payments assessed to pay death losses, an amount graduated according to the policy holder's age

at the time of the assessment, the amount of his policy, and the aggregate indemnity in force with the company at the time of each death, with due allowance for discontinuance of membership, one-third on each call to be applied toward a safety fund until the sum of $10 for $1000 had been paid "when the basis of all subsequent mortality calls shall be two-thirds only" of the amount named in the table indorsed on the certificate. This safety fund was to be deposited with the "security company," a corporation formed to take care of it for an additional compensation out of this income. The earnings of this fund after it should reach $300,000 and all contributions to it after it should reach $1,000,000 in United States bonds par value were to be divided among certificate-holders of five years' standing in proportion to the amount of their certificates; and if the aggregate amount of the certificates should fall below $1,000,000 the principal of the fund should be similarly divided. The fund accumulated rapidly, and in 1889 the Security Company had ceased to buy United States bonds, and in that year, notwithstanding its contract with policy-holders, the appellant secured the passage of a resolution by the Legislature of Connecticut authorizing the investment of the fund in other securities. Under this permission the fund was invested in other securities, including stocks of the New York, New Haven & Hartford and St. Joseph, Denver City & Southern railroad companies and of Hartford banks. In 1899 they ceased the issue of certificates in this department and thus practically put an end to the influx of $10 contributions which, the fund having reached its maximum of $1,000,000 must be divided among the certificate-holders. Things were in this condition when the Dresser suit was instituted in 1907 and went to final judgment March 23, 1910. The court ruled that the Act of 1889 was unconstitutional and void as impairing the obligation of the contract of the company with the certificate-holders and found that as a result of investments in other securities than United States bonds losses had been incurred, so that the actual value of the fund remaining was somewhat less than

$1,000,000; that excessive charges had been made by the Security Company for its management, so that the court required over $40,000 of this compensation to be returned and distributed to the certificate-holders. It also found that, although the company had levied assessments to cover the full amount of the certificates for each death during the previous quarter, they deducted, in making payment, from the face of such certificates, a certain proportion of the assessment that would have been due from the holder had he survived the quarter, so that there was a margin arising between the amount of the losses paid and the amount of losses assessed for, which had accumulated in the mortuary fund and had been used for the payment of losses in advance of the receipt of the assessments by which it was reimbursed. This accumulation amounted to "many thousands of dollars," which belongs to the certificate-holders. The court held that it was proper that the defendant should hold *some such fund* for the purpose of enabling it to pay losses promptly, but that it was not necessary that the company should hold more than the amount of one average quarterly assessment for the previous year.

After reciting these facts the judgment proceeded:

"Whereupon it is adjudged and decreed that said mortuary fund of the men's division arising from the excess of the amount received for quarterly assessments over the amount necessary for the payment of losses for said quarter, as above described, or from any other sources, together with all income or interest thereon, belongs to the certificate-holders in the men's division of the safety fund department, and the Insurance Company is reasonably entitled to hold the same as a necessary and proper fund for the settlement of death claims on the certificates of insurance in said department."

It then ordered that "any excess in said fund above the average of the four preceding quarterly assessments in said men's division shall be distributed to the certificate-holders *in diminution of assessments.*"

The call in question is as follows:

Hartford Life Insurance Company.

Hartford, Conn., January 29, 1910.

Special Notice of Quarterly Call No. 126.

Your next quarterly call will fall due and be payable June 1, 1910. Frank Barber, 4201 Pleasant St., St. Louis, Mo.

2-174416                                                                          15

This call which will be due March 1, 1910, is made to meet 119 deaths (as shown by accompanying list), benefits, $322,378.48, and expenses on your policy, as follows:

For mortality call ..........................................$13.09
For quarterly dues to June next.............................. 1.50

Credit .....................................................$14.59
Dividend to be applied if payment be made................... 1.40

Amount due .................................................$13.19

Payment will not be accepted later than Mar. 5, 1910, unless residence is on or west of the meridian of Salt Lake, Utah, in which case payment will be accepted up to and including Mar. 15, 1910.

Unless the payment called for by this notice shall be paid to the company at its home office by or before the day it falls due the policy and all payments thereon will become forfeited and void.

Return this notice with remittance payable to Hartford Life Insurance Company.

Make all remittances by draft, check, P. O. or express money order when possible. Letters containing currency must be registered.

See over for special notice.

### Special Notice.

If the payment of the above quarterly call is not received at this office on or before Mar. 5. 1910, the last day allowed for payment in the above notice, a second notice will be mailed to the policy holder by registered letter, giving until Mar. 20, 1910, to remit, and the same charge will be made for this second notice as is fixed by the law of Massachusetts, namely, fifty cents.

Every member whose payment does not reach this office on or before Mar. 5, 1910, will be obliged to pay fifty cents fee in order to have the policy unconditionally reinstated.

After Mar. 20, 1910, the limit allowed for payment under the registered notice, the company reserves the right to require a medical examination as a condition of reinstatement."

The credit of $1.40 is Barber's share of the excessive compensation taken by the Security Company for the care of the safety fund. The amount of this fund, for which charges were being made up to and at the time of the Dresser trial, was more than $1,000,000.

The assessment in question was made as of December 31, 1909. At that time all of the one hundred and nineteen death losses enumerated in the notice had been paid except fifteen, aggregating $41,000, and there was remaining in the mortuary fund $74,938.92; and the interest on the safety fund was paid into it on the same date, making an aggregate of $94,386.31 then in the fund. The

defendant introduced evidence showing that there were unpaid death losses amounting to $128,166.67 or more than $87,000 in addition to those included in this assessment still unpaid, and accounted for this fact by saying that the time of payment of losses included in the previous assessment had been extended, so that the collections for the payment of those losses had not yet been made.

The appellant asked upon the trial and the court refused. an instruction to the effect that there was no evidence that the refusal of the defendant to pay the sum sued for was vexatious, and for that reason they should not allow any sum for damages or attorney's fees should they find for the plaintiff. It also, both upon the trial and in its motion for a new trial, contended that the action of the court in excluding the record in the Dresser case violated section 1, article 4, of the Constitution of the United States, providing that "full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State." Such further reference will be made to the record as seems to be necessary.

I. The defendant pleaded in its answer that the provision of section 7068, Revised Statutes 1909, was unconstitutional and void and therefore could not be made

**Vexatious Delay.**
the basis of any recovery for damages and attorney's fees in this suit. This claim has been rejected by this court and the Supreme Court of the United States until it has become too stale to serve as a foundation for our jurisdiction. [Keller v. Home Life Insurance Co., 198 Mo. 440; Fidelity Mutual Life Assn. v. Mettler, 185 U. S. 308; Iowa Life Insurance Co. v. Lewis, 187 U. S. 335; Farmers' Ins. Co. v. Dobney, 189 U. S. 301; Fraternal Mystic Circle v. Snyder, 227 U. S. 497.] It is probably in view of these repeated decisions and others to the same effect that the appellant has not favored us with a brief or argument upon this point.

269 Mo. 3

II. Our jurisdiction rests solely upon the point that the trial court erred in rejecting the record of a judgment of the superior court of Connecticut for New Haven County in the case of Ibs and others, holders of like certificates in the safety fund department of defendant, suing on behalf of themselves and of all others similarly situated, against this defendant, the Security Company named in the certificate here sued on, together with the members of the board of directors of defendant for the time being. This case went to final judgment in the Connecticut court March 23, 1910. By this judgment the court attempted to make some radical changes in the contract here sued on and this attempt, applicable to this case in some respects which we shall notice, has received the indorsement of the Supreme Court of the United States in Hartford Life Insurance Co. v. Ibs, 237 U. S. 662.

The grounds upon which the plaintiff objected to the admission of this record were many, but its exclusion fairly raised the constitutional question whether or not, in that action, full faith and credit was given to the record of a judicial proceeding in the Connecticut court as required by the Federal Constitution. Among these objections were some relating to its certification and completeness, but these are shown to have been groundless by an additional abstract. Objection was also made that the judgment was not properly pleaded as an adjudication by the Connecticut court of the matter involved. This objection would probably have been well taken had it been directed against the answer before trial, but its effect, so far as applicable to the case, was generally stated and ought not to have been allowed to interfere with the trial by forcing an amendment during its progress. We think the constitutional point was well taken and shall consider the case in the light of the rejected evidence.

The legal maxim that the law abhors a forfeiture carries with its own reasons. One who, like this respondent, has for seventeen years regularly contributed to a

*Objection to Pleading.*

fund for the indemnity of others ought not to be de-

**Assessment.** prived of all the benefit which he himself was to receive as his compensation other-
wise than by the honest performance of all the condi-
tions upon which he had agreed to surrender it. He
has placed himself in the hands of others who for their
own profit have assumed the duty of his protection, and
they can have no right to take his money and refuse the
protection other than the right which grows out of the
strict performance of their own undertaking; and where,
as here, they seek after his death to appropriate to
themselves the benefit of the insurance for which he has
stipulated because of his failure to pay an assessment
against him, it is but just that they should show that
there was such an assessment, and that it is a liability
which he had bound himself by his contract to pay. The
burden falls justly upon them to show a performance
as strict and liberal as the performance they seek to
exact from him. This is not a favor which the law
grants him, but simply the fair and equal treatment to
which every one is entitled before the law, which abhors
an injustice. The assessment is the ground of his lia-
bility, and until it is shown to have been made in ac-
cordance with the contract he cannot be deprived of the
indemnity which the contract gives him. [Hannum v.
Waddill, 135 Mo. 153; Settle v. Insurance Assn., 150
Mo. App. 520, 528; Wayland v. Indemnity Co., 166 Mo.
App. 221; Earney v. Modern Woodmen, 79 Mo. App.
385; King v. Hartford Life Ins. Co., 133 Mo. App. 612;
Craig v. Insurance Co., 136 Mo. App. 5; Baker v. In-
surance Co., 51 Mich. 243; Insurance Co. v. Comfort,
50 Miss. 662; 2 Cooley's Briefs on Insurance, pp. 1871,
1872.]

III. The defendant does not contend that an assess-
ment should be made for the payment of a death loss
until a death has occurred. [Bacon on Benefit Societies

**Excessive Assessment.** and Life Insurance, section 377.] But it says that this rule was modified by the de-
cree of the Connecticut court in the Dresser
case. It is therefore necessary to examine the policy in

connection with that decree to ascertain the powers of appellant in this respect; and in doing so we must consider the various funds involved in the inquiry.

The defendant company seems to have had a checkered career. It was organized under an act of the Connecticut Legislature, in 1866, as the "Hartford Accident Insurance Company." The next year its name was changed to the "Hartford Life & Accident Insurance Company," and the next year (1868) it was again changed to the "Hartford Life & Annuity Insurance Company" and authorized to "make contracts, upon any and all conditions appertaining to or connected with life risks, annuities and reversionary interests of whatever kind and nature." It then became a full-fledged life insurance company. Its business kept pace with these changes, and in 1879 it reduced its capital stock and organized the safety fund department in which these policies were issued, and continued to write that kind of insurance until 1899 when it ceased to issue such policies, but has continued to administer the funds created under their terms. The plan was the same as that expressed in the policy sued on. Each certificate-holder contributed $10 per $1000 of insurance to form the "safety fund," which was to be held and administered by a corporation formed by themselves, called the "Security Company." When the fund reached $300,000 its income was to be distributed among the policy-holders according to the amount of insurance held by each, by applying it in reduction of their future assessments. It was to be invested in United States bonds and when it reached the sum of $1,000,000 "in United States bonds" no further accumulation was to be made, but all future payments by policy-holders of the $10 per $1,000 required for that fund were to be divided among policy-holders of five years' standing and applied to reduce assessments the same as the interest. Although the fund reached the magnitude of $1,000,000, it never reached that amount in United States bonds, but was invested in other securities, including railway and bank stocks and irrigation bonds. At the time of the assessment here in question

the principal of this fund amounted to $1,166,354.29. How much it had been depleted by losses up to that time does not appear. The income of it is, under the contract contained in the policies, paid into the mortuary funds semiannually, and distributed in reduction of mortality assessments.

There is one more fund which is material in this controversy. It will be seen from the terms of this certificate that upon payment of a death loss ''any mortality or other charge against the member payment of which is not matured'' is to be deducted. In other words, if he died after the close of the assessment quarter and before payment of the assessment was due, the entire assessment was to be deducted; if before the end of the quarter only, the *pro rata* amount up to the time of his death was to be deducted from the amount of the indemnity paid. In this way each assessment was excessive to that extent, and the excess, amounting to ''many thousands of dollars,'' together with the surplus resulting from the overestimate of probable lapses, all of which was applicable to the payment of mortality assessments, had, at the time of the Dresser judgment, been kept in the mortuary fund for the payment of death losses in advance of the assessments, and this constituted the fund for the prompt payment of losses which the Connecticut court had in view when it entered the judgment. It was a fund being continually replenished at the occurrence and payment of each death loss, and the same fund about which it said in its judgment:

''The plaintiffs claim it was improper and wrongful to accumulate these *margins* and to carry this balance in said mortuary fund, and claimed that said balance of *margins* should be distributed amongst the outstanding certificate holders, but it held that it is proper and reasonable that the company should hold *some such fund* for the purpose of enabling it to pay losses promptly, but that it was not necessary for that purpose that the company should hold more than the amount of one average quarterly assessment for the previous year.''

It is plainly seen from an attentive reading of this judgment that the court did not have any idea of undertaking to make a new contract for these certificate-holders or to change the old one. It had no more right to do this than did the Legislature, and asserted no such right, but it found this fund present in the mortuary fund; it was a flexible one because replenished by each death loss, and the court considered it proper that it should be used for any lawful purpose connected with the fund from which it had been taken by a slight and perhaps necessary safety margin in the assessment for each loss; and it was proper, in the estimation of the court, that such part of it as should be reasonable and necessary, not to exceed the amount of the average assessment for the next preceding year, should be used for the prompt payment of losses and that the remainder should be used in reduction of the succeeding assessment.

In the light of these three funds, that is to say (1) the fund proceeding directly from the regular quarterly assessments to pay the losses for which they are made, (2) the interest on the safety fund, and (3) the "margins" referred to in the Dresser judgment, we will examine the assessment for the last quarter of 1909 embodied in call 126. The average amount of the quarterly assessments for the preceding year had been $300,-000, to which amount the defendant was limited by the judgment in maintaining this emergency fund. The assessment was levied by its express terms to pay one hundred and nineteen death losses therein enumerated, amounting, in benefits, to $322,378.48. On December 31, 1909, the last day of the quarter for which it was levied, all these losses except fifteen, amounting to $41,-000, had been paid out of the fund on hand and there remained $74,938.92. On the same day there had been paid into the fund from the income account of the safety fund $19,447.39, making the amount left on hand $94,-386.31. Deducting from this $41,000, the amount of the fifteen unpaid losses, left $53,386.31. In other words, the payment of all losses for which this was to be made left the last-mentioned amount on hand in the fund, to

be "replenished" by the $322,387.48.   This left a permanent fund on hand to the amount of $375,764.79, or nearly $76,000 in excess of the amount authorized by the Connecticut court and which represents the amount of excess above that authorized by the contract as modified by the judgment.

When this appeared in its evidence, the defendant attempted to explain by the statement that there were other death losses which had accrued up to and including that day, bringing the total amount unpaid up to $128,000 in round numbers.   Were this true, and the proofs in the hands of the company, they should have been included in that assessment, but no claim is made that they belonged there.   If the death had occurred before that date and no proof had been furnished the company, the fund would be "replenished" to that amount in the next assessment so that, they would have no influence whatever in determining the amount of call 126, but could be promptly paid out of the surplus that call would leave on hand.   It is intimated, however, that the $87,000 of these losses not included in call 126 had been included in previous assessments, the payment upon which had been extended out of kindness to the certificate-holders;   and this suggestion is given color by the report of defendant filed in the insurance department of Missouri as of that day, in which the following item appears:   "Net premiums in course of collection safety fund department $185,000."   And as this included both the men's and. women's division of that fund it would probably account for the proportion of such pending collections in the men's department.   For this an assessment had already been made which should be added to the amount of call 126 as a means of replenishing the fund.   Its inclusion in this transaction in any other form would be in plain violation of the terms of both the policy and judgment.

It follows that the appellant, instead of sustaining the burden of proving a valid assessment as a foundation for the forfeiture of this policy, has shown a grossly excessive one made without authority either in

the contract or the judgment in the Dresser case, and in pursuance of a policy which runs like a sordid thread through the record, of accumulating large funds at the expense of the policy-holders, and withholding them as long as possible from distribution. When we consider that, in addition to what it received out of the income of these funds, it was collecting at the time this assessment was made, and receiving as compensation for the conduct of this remnant of an abandoned business, about $85,000 per year from the policy-holders, we can see no excuse for extortion. We do not think a forfeiture can stand on the foundation of this assessment.

IV. The appellant in argument contends that the policy was properly forfeited for nonpayment of ten cents, a balance which it claims to have been due on the following figures. It charged Mr. Barber one-fourth of his annual dues under the policy for expenses—$1.50. The court in the Dresser decree had ordered that $40,046.36 illegally withheld from the policy-holders on account of excessive fees exacted for the care of the safety fund should be returned to them. On this account $1.40 was credited as the share running to this policy, leaving ten cents due in addition to the assessment for mortuary purposes. The policy, in this respect, runs as follows:

**Failure to Pay Dues.**

"In consideration of . . . $3 per annum on each $1000 of the indemnity herein provided for, expense dues, to be paid as hereinafter conditioned."

The policy is dated September 4, 1893. On the next page are the "conditions" which, with respect to this payment, are as follows:

"The member agrees to pay to said company, for expenses, dues of $3 per annum on each $1000 indemnity on the first day of the month after date of issue hereof, and at every anniversary thereafter, so long as this certificate shall remain in force; or by *pro rata* installments of the same, in advance, for periods of less than a year."

We have searched this voluminous record carefully for any evidence of any other arrangement. This was

by the terms of the policy due on October 1st of each year and we see nothing in the provision we have quoted which gave the appellant the right at its own election, and without the consent of the policy-holders, to make it otherwise payable. The forfeiture cannot stand on this ten cents.

V. In all the mutations which the appellant has undergone at the hands of the Legislature, there are some things in its original charter which seem to have remained intact. One of them provides: "All the affairs of said corporation shall be managed and controlled by a board of not less than seven directors (the number of said directors to be determined by the by-laws of said company)" and the other vests the power to make by-laws in the stockholders. It is not contended by the appellant that this assessment was made by the directors or by any committee appointed by the directors, or in accordance with any rule prescribed by them, or that it ever passed under their observation as a board, or was ever spread upon the corporate records. Nor is it contended that there is any by-law prescribing the method of levying the assessment. The action of the company in making assessments involved the use of the highest discretion. It claimed the right, in the performance of that act, to determine an amount to be kept on hand for the payment of all such losses as might occur immediately upon the receipt of the proof and independently of any assessment therefor. The levying of these assessments and the determination of the amount of this fund which was limited only by circumstances of which it was required to judge, subject only to the maximum prescribed in the Dresser judgment, were the highest and most important acts, and involved the largest discretion of any which related to the class of insurance to which its activities were mainly directed during the twenty years preceding 1899. If the legislative direction that *all* its affairs were to be managed and controlled by their direction did not include this, it would be difficult to say what it did include. It evidently means

*Power of Executive Officers.*

more than the appointment of the usual officers of such corporation. Under these circumstances we think the executive officers of the company were without power to determine these things and to levy these assessments otherwise than under their direction to be shown by its records. [Bacon on Benefit Societies and Insurance, section 377; Farmers' Milling Co. v. Insurance Co., 127 Iowa, 314; Insurance Co. v. Chase, 56 N. H. 341; Garretson v. Equitable M. L. Assn., 93 Iowa, 402.]

We have examined the cases referred to by appellant, and note that the Fee case (Fee v. Accident Assn., 110 Iowa, 271), is necessarily overruled by the Mill Owners case, supra, 127 Iowa, 314; and Miles v. Life Assn., 108 Wis. 421, construed a charter so different from the one we are considering as to make it entirely inapplicable to this case. The same may be said of Insurance Co. v. Birnbaum, 116 Pa. St. 565. There is nothing in either of these cases tending to disapprove the position we have taken.

VI. The submission of the question of damages and attorney's fees to the jury was proper under the rule stated by this court in Keller v. Home Insurance Co., 198 Mo. 440, and Brown v. Assurance Co., 45 Mo. l. c. 227, where it is said that:

"The whole question of vexatious refusal or delay is a matter of fact to be determined by the jury. They must make up their verdict on this issue by a general survey of all the facts and circumstances in the case; and if, upon full consideration, they conclude that the refusal was unjustifiable and vexatious, the law authorizes them to assess the damages. The statute will not admit of the construction contended for by the counsel for the plaintiff in error, that before damages are allowed it must be explicitly proved by the plaintiff that the delay or refusal was vexatious."

Vexatious Delay.

We think that under this rule the evidence was ample to justify the submission of that question, and that the instruction of the court properly defined the duty of the jury. There having been no error in this and the appel-

Barber v. Insurance Co.

lant having failed to sustain the burden of showing, or presenting evidence tending to show, the levy of a legal assessment in the matter of call 126, for the nonpayment of which it seeks to forfeit the policy sued on, the judgment of the circuit court is affirmed.

*Railey, C.,* not sitting.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All the judges concur.