## McCORNICK & COMPANY v. CITIZENS BANK OF HUTCHINSON, KANSAS, Appellant.

### Division One, June 10, 1924.

1. **APPELLATE PRACTICE: Action at Law: Findings.** In an action at law, a jury having by agreement of parties been waived and the cause submitted to the court, the findings of fact by the court, if supported by substantial evidence, are binding upon the appellate court.

2. ———: ———: ———: **Construction of Foreign Statutes and Decisions.** · In determining the liability of a bank upon a guaranty of payment of drafts drawn upon a customer made in a foreign state, the appellate court will consider the statutes and decisions of such foreign state offered in evidence, being writings, and will determine whether the trial court erred in its construction of such evidence.

3. ———: ———: ———: **Mixed Question of Law and Fact.** A finding by the trial court sitting as a jury in a law case that "the guaranty sued upon and the ones preceding it were issued by defendant in the ordinary and regular course of business in furtherance of de-

McCornick & Co. v. Citizens Bank.

fendant's corporate purposes and for its own as well as for its customer's benefit and the interests of defendant were thereby promoted," is a finding upon a mixed question of law and fact, and its sufficiency is for consideration on appeal.

4. ——: ——: ——: Unmixed Question of Fact.   Findings by the trial court sitting as a jury in a law case (a) that the defendant bank received exchange fees upon the drafts handled· by it pursuant to an arrangement with plaintiff by which the payment of the drafts was attempted to be guaranteed;  (b) that defendant's customer upon whom the unpaid drafts were drawn was financially responsible and agreed to fully protect defendant against loss upon any draft paid by it;  (c) that defendant is amply protected against loss by reason of having issued the guaranty;  (d) that said customer has employed counsel to represent defendant in, and is bearing the expense of, the suit upon the guaranty, and (e) that said customer received thirty-four cars of potatoes, the purchase price of which is represented by an equal number of drafts whose payment was guaranteed by defendant's telegram to plaintiff, and that they have not been· paid, are all findings upon unmixed questions of fact, and being supported by substantial evidence are binding on appeal.

5. GUARANTY: In Regular Course of Business: One Customer.   A finding that the guaranty sued upon and the ones preceding· it were issued by defendant bank "in the ordinary and regular course of business" is too broad, where the evidence discloses that defendant guaranteed the payment of the drafts of only one customer and in a single transaction.

6. ——: Drafts of Third Parties: Ultra Vires.   Under the statutes of Kansas, as interpreted by the decisions of its courts, a banking corporation of that state has no power to guarantee the payment of drafts drawn by one produce merchant upon another;  and· an attempt by such bank to guarantee the payment of a draft drawn on one of its customers, a third party, was an *ultra vires* act.

7. ——: ——: ——: Estoppel.   Under the law of Kansas (which is the same as the law elsewhere) a banking corporation which receives the benefits of its *ultra vires* contract cannot plead *ultra vires* and hold the benefits.   So that a bank which in' order to receive the business of a valuable customer with full knowledge obtained by past experience, guaranteed that the drafts of a produce dealer drawn on said customer, when received by it with the bill of lading attached, would be paid, and paid a part of them, and when sued upon its guaranty for the amount of the unpaid drafts admits that said customer is financially responsible and that it is

fully protected against loss if compelled to pay said drafts, and knew at the time it made the guaranty and received the customer's deposits that he was entirely solvent, and said customer employs counsel to defend the suit and assumes the expense of the litigation, and it appears that the customer would not have obtained possession of the produce had it not been for the assistance of the bank in handling the bills of lading attached to the unpaid drafts, the bank is precluded from interposing the defense that the guaranty was an *ultra vires* contract.

Headnotes 1 to 4: **Appeal and Error:** 1, 4 C. J. sec. 2853; 2, 4 C. J. sec. 2539; 3, 4 C. J. sec. 2540; 4, 4 C. J. secs. 2538, 2853. Headnotes 5 and 7: **Banks and Banking:** 5, 7 C. J. sec. 569; 7, 7 C. J. sec. 240. Headnote 6: **Banks and Banking,** 7 C. J. sec. 239; **Corporations** 14 A. C. J. sec. 2786.

Appeal from Jackson Circuit Court.—*Hon. Thomas B. Buckner,* Judge.

Affirmed.

*James A. Goodrich, Lebrecht & Kaspar* and *Milford W. Rider* for appellant.

(1) A Kansas state bank has no power to lend its credit by guaranteeing obligations of another thereafter to be created. Sec. 514, General Statutes Kansas 1915, as amended by Secs. 1 and 2, Chap. 79, Laws of Kansas 1917; Sec. 556, General Statutes Kansas, 1915; Ingersoll v. Kansas State Bank, 202 Pac. 837, 110 Kan. 122; Long Bros. v. Hubbard, 6 Kan. App. 878; Cattle Co. v. Loan Co., 65 Kan. 359. (2) The trial court erred in its finding that the issue of such guaranty was not *ultra vires.* Sec. 514, General Statutes Kansas 1915, as amended by Secs. 1 and 2, Ch. 79, Laws of Kansas 1917; Sec. 556, General Statutes Kansas, 1915; Ingersoll v. Kansas State Bank, 110 Kan. 122; Long Bros. v. Hubbard, 6 Kan. App. 878; Cattle Co. v. Loan Co., 63 Kan. 359; Sponge Exchange Bank v. Commercial Credit Co., 263 Fed. 20; Greely v. Bank, 63 N. H. 145; Willet v. Bank, 107 Iowa, 69; Laidlaw v. Pacific Bank, 137 Cal. 392, 70 Pac. 277; Met. Stock Exchange

Bank v. Bank, 76 Vt. 303, 57 Atl. 101; Appleton v. Bank, 190 N. Y. 417; Franklin Company v. Bank, 68 Me. 43, 28 Am. Rep. 9; McGee on Banks & Banking (3 Ed.) sec. 361, p. 690; 1 Morse on Banks & Banking, sec. 365. (3) Under the law of Kansas the doctrine of estoppel to set up *ultra vires* as a defense to liability on contract, because the other party has fully performed the contract or because defendant has received the benefits of performance by the other party, has no application to the case of officers of a bank attempting to lend its credit by guaranteeing obligations of another thereafter to be created. Tracy Loan & Trust Co. v. Merchants Bank, 167 Pac. 353; Bowen v. Needles National Bank, 94 Fed. 925; Bacon v. Bank, 79 Mo. App. 406; National Bank of Moscow v. Am. Bank, 173 Mo. 153; Ingersoll v. State Bank, 202 Pac. 837, 110 Kan. 122; State ex rel. Hadley v. Bankers Tr. Co., 138 S. W. 669.

*McCune, Caldwell & Downing* for respondent.

(1) Even if the issuance of said guaranty of November 18th were considered to be *ultra vires* or beyond the power of the officer who executed it, defendant, having received benefits from it, is estopped from setting up the defense of *ultra vires* or want of authority and cannot avail itself of those defenses. The defense of *ultra vires* must yield to considerations of right and justice. Sec. 11829, G. S. Kansas 1915; Harris v. Independence Gas Co., 76 Kan. 750; Sherman Center Town Co. v. Russell, 46 Kan. 382; Hanna v. Ry. Co., 89 Kan. 503; Saylors v. State Bank of Allen, 99 Kan. 515; Ballard v. Bank, 91 Kan. 91; Security Natl. Bank v. McCutcheon, 106 Kan. 303; Avery v. Moore, 87 Kan. 337; Jones & Brother v. Kuhn, 34 Kan. 414; 3 Fletcher Enc. Corp., secs. 1592, 1596. (2) The Kansas decisions and statutes relied upon by appellant convict the trial court of no error. (3) The decisions cited by appellant from jurisdictions other than Kansas

do not rule this case, because the so-called Federal rule pertaining to *ultra vires* is not the law of Kansas. Harris v. Independence Gas Co., 76 Kan. 750. Likewise it is not the law in a number of other jurisdictions. Farmers & Merchants Bank v. Illinois Natl. Bank, 146 Ill. App. 136; Creditors Co. v. Northwest Loan & Tr. Co., 81 Wash. 247; El Paso Bank v. Bank, 202 S. W. (Tex. App.), 522; Bank of Italy v. Bank, 188 N. Y. Supp. 183; Bushnell v. National Bank, 10 Hun, 378; Whitney Arms Co. v. Barlow, 63 N. Y. 62; First Natl. Bank v. Womack, 157 Pac. (Ok), 207.

GRAVES, J.—Pleadings and facts can best be stated together. The plaintiff is a banking corporation of the State of Utah, at Salt Lake City, Utah. Defendant is a banking corporation of the State of Kansas, at Hutchinson, Kansas. Wm. D. Ebbert, Inc., of Idaho Falls, Idaho, was engaged in buying and selling potatoes and similar commodities. Among its customers was the Grovier-Starr-Parvin Company of Hutchinson, Kansas, with which quite a business was done in the year of 1920. The method of business was about as follows: Grovier-Starr-Parvin Company arranged with their bank (the bank where their deposits were kept) which is the defendant herein, to guarantee the payment to McCornick & Company, Bankers, the drafts which Wm. D. Ebbert, Inc., might draw through McCornick & Company, to which drafts were to be attached the bills of lading for the produce shipped. The first guaranties made by defendant to plaintiff were in the aggregate sum of $75,000. Produce was shipped by Wm. D. Ebbert, Inc., to the Grovier-Starr-Parvin Company, to that amount, and drafts were drawn and paid to that amount. These drafts were drawn payable to plaintiff, and Wm. D. Ebbert, Inc., was given credit therefor as if cash—this under the strength of the guaranty of payment aforesaid. The petition pleads fully the arrangement and course of conduct. Following this arrangement and course of conduct, on November 19, 1920, the defendant sent to plaintiff the following telegram:

"McCornick & Co. Bankers,

"Salt Lake City, Utah.

"Abaco Misquote papitate W. D. Ebbert gang-board on Grovier Starr Parvin total not exceeding thirty thousand.

"THE CITIZENS BANK."

Which translated according to the code in use by plaintiff and defendant reads:

"We guarantee payment to be made W. D. Ebbert bill of lading attached to draft on Grovier-Starr-Parvin total not exceeding thirty thousand."

It is averred that it was understood by the parties, plaintiff and defendant, that drafts signed by Wm. D. Ebbert, Inc., payable to plaintiff, and drawn against the Grovier-Starr-Parvin Company when bills of lading were attached thereto, were covered by this guaranty made by the telegram aforesaid. After the receipt of this telegram, the plaintiff cashed drafts of Wm. D. Ebbert, Inc., in the total sum of $16,122.58; that drafts to the amount of $2,550.28 were paid after this guaranty of $30,000 was made; that the remaining drafts (34 in number) were refused payment.

The suit by plaintiff is to recover on the guaranty of $30,000 the aggregate of the drafts refused payment, in the alleged sum of $13,572. The suit was instituted by attachment in Kansas City, Missouri.

The answer was (1) a general denial; (2) that the telegram of guaranty was sent without authority of the board of directors of defendant bank; (3) that the act, if done by the bank was, *ultra vires,* and (4) that it was without consideration.

Reply was (1) a general denial of new matter in the answer; (2) an admission that the contract of guaranty was a Kansas contract, and to be governed by Kansas laws; (3) that the common law was adopted and inforced in Kansas, and that under the decisions of that state (which decisions are pleaded) the doctrine of *ultra vires* will not avail defendant under the facts and the law, and (4) estoppel in the following language:

"That the defendant is estopped to rely upon and cannot avail itself of the alleged defense set up in the

allegations of new matter in the answer, because before obligating itself to plaintiff it took and received indemnity and guaranties satisfactory to it against loss by reason of said guaranty, and the one which preceded it as a part of an established course of dealing between plaintiff and defendant.

"That the defendant is estopped to rely upon and cannot avail itself of the alleged defenses set up in the allegations of new matter in the answer, because in order to secure and hold the lucrative banking business of a good customer and after taking and receiving indemnity and guaranties satisfactory to itself, plaintiff executed the guaranty sued upon and those which preceded it as a part of an established course of dealing between plaintiff and defendant, thereby securing and holding said banking business—all for the purpose and with the intent of having plaintiff advance and pay out money on account thereof and in reliance thereon, which money was so paid out by plaintiff, as alleged in its petition.

"Wherefore, plaintiff renews the prayer of its petition."

The record recites that "by agreement of the parties a jury was waived and the cause submitted and tried before the court without a jury." Finding and judgment was for the plaintiff in the sum of $12,530.50, and from such judgment defendant has appealed. Upon the request of plaintiff, the court made the following findings of fact:

"The court finds from the evidence:

"1. That in the fall of 1920 Wm. D. Ebbert, Inc., of Idaho Falls, Idaho, was engaged in the business of buying from growers in its territory potatoes and similar commodities, and in selling the same to, among others, Grovier-Starr-Parvin Company of Hutchinson, Kansas, said shipment having been made to such place as the latter company directed, consigned to it, and drafts for the purchase price of said commodities were drawn on said Grovier-Starr-Parvin Company at Hutchinson, Kansas.

"2.   That just prior to October 6, 1920, Ebbert, Inc., applied to plaintiff bank to accept the drafts referred to in the preceding finding as cash deposits and to extend to Ebbert a line of credit, all of which plaintiff refused to do, but plaintiff did agree to so handle such drafts if payment of the same was guaranteed by a responsible bank.

"3.   That just prior to October 6, 1920, said Grovier-Starr-Parvin Company applied to and arranged with defendant for defendant, from time to time as required, to guarantee to plaintiff the payment of drafts, representing the purchase price of commodities, drawn by Wm. D. Ebbert, Inc., upon Grovier-Starr-Parvin Company with bills of lading attached covering said commodities so sold and delivered or to be delivered to said last-named company, all for the purpose of inducing and procuring, as defendant well knew, plaintiff to pay the amount of such drafts to said Wm. D. Ebbert, Inc., upon their deposit with plaintiff at Salt Lake City, said drafts to be thereafter forwarded to Hutchinson for collection in the usual banker's manner.

"4.   That pursuant to such plan and on October 6th, 7th and 21st and November 11th, 1920, defendant by its several writings guaranteed to plaintiff payment of drafts drawn by said Wm. D. Ebbert, Inc., upon Grovier-Starr-Parvin Company, with bills of lading attached, aggregating $75,000; that drafts up to said amount representing the purchase price of commodities sold and delivered by said Wm. D. Ebbert, Inc., to Grovier-Starr-Parvin Company, were between October 6th and November 18th drawn by the former upon the latter, payable to the order of plaintiff, and that in reliance and upon the faith of said guaranties, plaintiff paid said Wm. D. Ebbert, Inc., said aggregate sum of $75,000 upon said drafts and thereafter forwarded the same, from time to time as received, to Hutchinson for collection, and they were there paid.

"5.   That on November 18, 1920, pursuant to the arrangement hereinabove mentioned, the guaranties pre-

viously given having been exhausted by drafts to an amount equal to the aggregate limit of said guaranties, defendant guaranteed payment of additional drafts, with bills of lading attached as aforesaid, drawn by Wm. D. Ebbert, Inc., upon Grovier-Starr-Parvin Company for the purchase price of potatoes or other similar commodities to be delivered by Wm. D. Ebbert, Inc., to Grovier-Starr-Parvin Company, the total not to exceed $30,000.

"6. That said guaranty was by telegram in writing from defendant to plaintiff, in words and figures as follows: 'Abaco misquote palpitate W. D. Ebbert gangboard on Grovier-Starr-Parvin total not exceeding thirty thousand,'' which translated according to the code in use by plaintiff and defendant reads: 'We guarantee payment to be made W. D. Ebbert bill of lading attached to draft on Grovier-Starr-Parvin, total not exceeding thirty thousand.''

"7. That it was understood by both plaintiff and defendant that the drafts so guaranteed would be drafts payable to plaintiff upon demand, just as the drafts previously guaranteed and paid had been, and that the bill of lading to be attached to each draft should evidence the receipt by a carrier of a car or cars of potatoes or other similar commodity consigned by Wm. D. Ebbert, Inc., to Grovier-Starr-Parvin Company, the purchase price of which car or cars would be represented by the draft to which said bill of lading would be attached.

"8. That upon the faith of said guaranty of November 18, 1920, and in accordance with the course of dealing between plaintiff and defendant, the plaintiff paid the said Wm. D. Ebbert, Inc., between November 18th and November 30, 1920, the sum of $16,122.58, upon drafts, with bills of lading attached drawn by Wm. D. Ebbert, Inc., upon Grovier-Starr-Parvin Company, payable to plaintiff; that each of said drafts was payable upon demand, and that to each draft was attached a bill of lading evidencing the receipt by a carrier of a car or cars of potatoes or other similar commodity consigned by Wm. D. Ebbert, Inc., to Grovier-Starr-Parvin Com-

pany, the purchase price of which car or cars was represented by the draft to which said bill of lading was attached.

"9. That all of said drafts so aggregating $16,122.58 were forwarded by plaintiff as received to Hutchinson for collection in the usual manner; that drafts aggregating $2550.28, part of said sum of $30,000, payment of which was guaranteed by said guaranty of November 18, 1920, and a part of the aforesaid drafts aggregating $16,122.58, were duly paid; but thirty-four drafts aggregating $13,572.30, a part of said sum of $30,000, payment of which was guaranteed by said guaranty of November 18, 1920, and a part of the aforesaid drafts, aggregating $16,122.58, were in the month of December, 1920, and prior to December 17, 1920, duly presented and payment demanded of the drawee, Grovier-Starr-Parvin Company, which refused to pay said drafts and each of them; that immediately thereafter, and on December 15, 1920, payment of said thirty-four drafts aggregating the said sum of $13,572.30, and each of them, was demanded by plaintiff from defendant, but defendant then and there refused and still refused to pay the same, assigning as a reason therefor that Grovier-Starr-Parvin Company had requested it not to.

"10. That there is now owing by defendant to plaintiff under said guaranty of November 18th the sum of $11,604.10, together with interest from December 16, 1920, demand having been made on December 15, 1920.

"11. That C. M. Branch, president, was the chief executive and managing officer of defendant.

"12. That prior to the issuance to plaintiff of the first of the guaranties already described, in the negotiations preliminary to the establishment of business relations between Grovier-Starr-Parvin Company and defendant, the former advised the latter that one of the requirements of its business was that its bank of deposit issue said guaranties, and defendant, in order to secure and hold the banking business of Grovier-Starr-Parvin Company, agreed that it would issue the same as it sub-

sequently did, thereby securing and holding said business.

"13. That under the arrangement aforesaid, Grovier-Starr-Parvin Company did in excess of $75,000 worth of business through defendant bank within two months and kept a substantial credit balance on deposit with defendant.

"14. That the guaranty sued upon and the ones preceding it were issued by defendant in the ordinary and regular course of business in furtherance of defendant's corporate purposes and for its own as well as for its customer's benefit and the interests of defendant were thereby promoted.

"15. That defendant received exchange fees upon some at least of the drafts handled pursuant to the arrangement aforesaid.

"16. That there was consideration for issuing the guaranty of November 18th and the ones preceding it and the defendant was substantially benefited by the arrangement under which the same were issued.

"17. The Grovier-Starr-Parvin Company and the members of that partnership are financially responsible and they agreed when the aforesaid arrangement was made that they would fully protect defendant and take care of any claim against defendant growing out of the issuance of said guaranties.

"18. The defendant is amply protected against loss by reason of having issued said guaranty of November 18th.

"19. That Grovier-Starr-Parvin Company has employed counsel to represent defendant herein and is bearing the expense of this litigation.

"20. That Grovier-Starr-Parvin Company received the thirty-four cars of potatoes, the purchase price of which is represented by said thirty-four drafts, aggregating $13,572.30, payment of which was guaranteed by the telegram of November 18th, and has not paid for them.

"21. The defendant is a corporation organized under the laws of Kansas, with its place of business in Hutchinson, Kansas; the guaranty sued upon was made and to be performed in Kansas; both parties have pleaded the laws of Kansas, and under the pleadings it is conceded and admitted that the laws of Kansas govern the issues herein.

"22. That under the facts hereinabove found, the law of Kansas is:

"(a) That the issuance of said guaranty of November 18th was within the powers of defendant bank, and not *ultra vires*.

"(b) That the issuance of said guaranty of November 18th was not in excess of and beyond the powers of defendant's president.

"(c) That even if the issuance of said guaranty of November 18th had been beyond the power of defendant's president or of defendant itself, it was so acted upon by plaintiff as to prevent a defense on those grounds being successfully interposed.

"(d) That even if the issuance of said guaranty of November 18th were considered to be *ultra vires* or beyond the power of the officer who executed it, plaintiff having fully performed its part of the agreement, defendant is estopped from setting up the defense of *ultra vires* or want of authority and cannot avail itself of those defenses.

"(e) That even if the issuance of said guaranty of November 18th were considered to be *ultra vires* or beyond the power of the officer who executed it, defendant, having received benefits from it, is estopped from setting up the defense of *ultra vires* or want of authority and cannot avail itself of those defenses.

"(f) That the defense of *ultra vires* must yield to considerations of right and justice."

This sufficiently outlines the case. The matters urged by appellant can best be noted in the course of the opinion.

I.  It is conceded by both sides that this is a case at law, and the findings of fact made by the court (if founded upon substantial evidence) are binding here. These findings we have set out in full. The case may be simplified by a disposition of some objections as to these findings. The objections go to two classes of the findings. There are objections to all of the several subdivisions of finding No. 22. This is a finding as to what the law of Kansas is, as such law is involved in this case. The evidence as to what that law is was before the court, and is now before us, but such evidence is in writing and we are not precluded from giving these writings (opinions and statutes) our own construction. In such situation we can view the writings and determine whether or not the court has erred in the construction given to such evidence. These matters will therefore be considered further in the course of the opinion.

It is further urged that there was no evidence upon which to base findings Nos. 14, 15, 17, 18, 19, and 20. There is substantial evidence to support findings Nos. 15, 17, 18, 19 and 20, and by these findings we are bound. Finding No. 14 is a mixed question of fact and law, and the sufficiency thereof will be left to other portions of the opinion. With the foregoing exceptions we shall proceed upon the facts as found by the learned trial judge. The exceptions constitute mixed law and facts.

II.  Finding No. 14 is too broad. We have it in **Regular Course** full in our statement, but we repeat it **of Business.** here at the expense of brevity. It reads:

"That the guaranty sued upon and the ones preceding it were issued by defendant in the ordinary and regular course of business in furtherance of defendant's corporate purpose and for its own as well as for its customer's benefit and the interests of defendant were thereby promoted."

The evidence does not justify this broad language. From this finding one would conclude that the giving of guaranties of the character of the one involved here was

generally done by the defendant bank in the course of its banking business, whereas there is no evidence of such being its general course of business. The evidence only shows that it did agree to do this with this one customer, and that it did give the guaranties we have mentioned in our statement. There is no evidence that they were issued "in the ordinary and regular course of business." The evidence only discloses a single transaction of this character, and this was by agreement with a single customer—the Grovier-Starr-Parvin Co.

III. Nor is there substance in the contention that the bank was authorized to give guaranties of the character *Ultra* herein involved, either under the statute law, or the *Vires* court decisions of Kansas. We must not overlook *Act.* the nature of the guaranty. It is one to insure the faithful performance of a third party. In this the case can be distinguished from many cases relied upon by respondent. We are discussing now the pure legal right of a Kansas bank to make generally guaranties of the character sued upon in this action. Under this point we are not discussing the question as to whether or not the bank may be (in this particular case) estopped from urging the defense of *ultra vires*. Whether or not the act is *ultra vires* is one question, and whether or not the corporation is precluded from urging *ultra vires* in a particular case, is another and different question. The first question we discuss under this point, but the latter we leave to a subsequent place in this opinion. The powers of a banking corporation in Kansas are prescribed by statute. The statute in force at the date of this transaction is found in the 1917 Session Laws of Kansas, page 104, and reads:

"Sec. 1. Any five or more persons may organize themselves into a banking corporation, and shall be permitted to carry on the business of receiving money on deposit and to allow interest thereon, giving to the person depositing credit therefor; and of buying and selling exchange, gold, silver, foreign coin, bullion, uncurrent money, bonds of the United States and of the State of

Kansas, and bonds and warrants of cities, counties, and school districts in the State of Kansas, *and state, county, city, township and school bonds issued in other states of the United States than Kansas,* of loaning money on real estate, chattel and personal security, at a rate of interest not to exceed the legal rate allowed by law; of discounting negotiable notes and of notes not negotiable, and to own a suitable building, furniture and fixtures for the transaction of its business, of the value not to exceed one-third of the capital of such bank; provided, that nothing in this section shall prohibit such bank from holding and disposing of such real estate as it may acquire through the collection of debts due to it.

"Sec. 2.   Original Section 514 of the General Statutes of 1915 is hereby repealed.

"Sec. 3.   This act shall take effect and be in force from and after its publication in the statute book."

The amendment of 1917 consisted in adding to the old law the clause which we have italicized above, and so far as the question involved in this case is concerned the amendment adds nothing to the law.   There is nothing in this statute which authorizes a banking corporation of Kansas to make contracts of guaranty insuring the payment of drafts between parties other than the bank.   The guaranty contract here involved is one wherein the defendant bank undertakes to insure the payment of drafts drawn upon a produce firm of Hutchinson, in which transaction the bank had no personal interest.   In the case of Ingersoll v. Bank, 110 Kan. l. c. 126, the Supreme Court of Kansas quotes and approves of the following from 14A Corpus Juris, page 739:

"Subject to the exceptions and qualifications hereinafter stated (exceptions not material here), the general rule is that no corporation has the power by any form of contract or indorsement to become a guarantor or surety or otherwise lend its credit to another person or corporation."

The court goes further, and cities from Kansas cases. The language used reads:

"To the same effect is 10 Cyc. 1109; 7 R. C. L. 603; Cattle Co. v. Loan Co., 65 Kan. 359, 362, 69 Pac. 332. Following this rule, the Court of Appeals in Long Bros. v. Hubbard, 6 Kan. App. 878, 883, used this language:

" 'Becoming surety upon undertakings is no part of the business of banks.'

"Under Section 6589 of the General Statutes of 1915, the acceptor of an instrument becomes the principal debtor thereunder. In Magee on Banks and Banking (3 Ed.) sec. 361, p. 690, this language is found:

" 'When a bank accepts a draft or bill of exchange for one of its customers, it merely lends its credit responsibility to its customer in order that he may procure the funds elsewhere.'

"That a bank does not have authority to do. [1 Morse on Banks and Banking, sec. 65; 3 R. C. L. 425; and authorities cited above.]"

The foregoing is the latest expression of the Supreme Court of Kansas, wherein is discussed the powers of a banking corporation under the Act of 1917. Under the statute and the express ruling of the Kansas Supreme Court a contract of guaranty by which the payment of money by a third party is insured is an *ultra vires* act by a Kansas banking corporation . In Cattle Co. v. Loan Co., 65 Kan. l. c. 362, cited in the above case, the court cites with approval the following general rule announced in 7 Am. & Eng. Ency. Law (2 Ed.) p. 793:

" 'A corporation, as has been seen, may issue and indorse negotiable bills and notes whenever it is necessary or usual in the course of its authorized business; but by the overwhelming weight of authority, a corporation has no power to issue or indorse, for the accommodation of others, bills or notes in which it has no interest, unless, as is seldom if ever the case, such power is expressly conferred.' [See, also, Rahm v. Bridge Manufactory, 16 Kan. 277; Ryan v. Leavenworth, A. & N. W. Ry. Co., 21 Kan. 365; 4 Thomp. Corp. secs. 4637, 5739.]"

The contract of guaranty in this case was simply lending the credit of the bank to Grovier-Starr-Parvin

Company, one of its customers, and if this was permissible, no person could determine the liability of a banking corporation. The general rule is otherwise, and there is no statute in Kansas authorizing a Kansas bank (either with or without consideration) to make and enter into such a contract. So that upon the face of the contract sued upon it appears to be an *ultra vires* act.

V. We have indicated that there was evidence to support findings 15, 16, 17, 18, 19 and 20.

**Facts Constituting Estoppel.** These findings should be incorporated here, as follows:

"15. That defendant received exchange fees upon some at least of the drafts handled pursuant to the arrangement aforesaid.

"16. That there was consideration for issuing the guaranty of November 18th and the ones preceding it and the defendant was substantially benefited by the arrangement under which the same were issued.

"17. That Grovier-Starr-Parvin Company and the members of that partnership are financially responsible and they agreed when the aforesaid arrangement was made that they would fully protect defendant and take care of any claim against defendant growing out of the issuance of said guaranties.

"18. That defendant is amply protected against loss by reason of having issued said guaranty of November 18th.

"19. That Grovier-Starr-Parvin Company has employed counsel to represent defendant herein and is bearing the expense of this litigation.

"20. That Grovier-Starr-Parvin Company received the thirty-four cars of potatoes, the purchase price of which is represented by said thirty-four drafts, aggregating $13,572.30, payment of which was guaranteed by the telegram of November 18th, and has not paid for them."

When the Grovier-Starr-Parvin Company opened up business in Hutchinson, Kansas, it arranged to do their banking business with the defendant. The record shows that its account was one of business moment. At this time

said company told the bank that, in their business, they would have to have guaranties of the character here involved. The bank accepted the account with this imposed duty, but the company agreed to protect the bank. It is not questioned that these parties are financially responsible. The officers of the bank testify that the bank is fully protected, although they add ''not in writing.'' They decline to disclose some facts. It is clear that the defendant bank is not making the defense in this case. This defense comes from the company, which by some means got possession of the produce which was accompanied by drafts and bills of lading, and these drafts seem to have gone through defendant bank's hands. Just how the company was able to get the produce without paying the drafts is not clear, but that it did get such produce, and did not pay for it, is clear. Defendant bank, before wiring the guaranty herein sued upon, was fully advised in the matter. It had paid the plaintiff bank $75,000 in drafts, drawn in the same way. They had even paid some drafts under the last guaranty contract of $30,000. Suddenly the defendant refuses payment of some $13,000 or more in drafts, because the Grovier-Starr-Parvin Company refused to pay. The produce (upon which drafts and bills of lading attached passed through defendant bank) landed into the possession of Grovier-Starr-Parvin Company, without payment therefor. That company is defending this suit, and the bank officers testify that they will not lose anything by an adverse judgment. Such are the real facts, and the simple question is, can the bank successfully interpose the plea of *ultra vires?* This question presents a totally different situation from that presented by the simple matter of *ultra vires.* First, we have the benefit accruing to the bank from handling a large account, with incidental small fees for drafts in settling bills. Of course the exchange fees are small and mere incidental to a large and substantial account. Secondly, we have the admitted contract to give these guaranty contracts because of the account, and, thirdly, we have the fact that defendant bank is fully protected from loss, according to their of-

ficers. The law of such situation we take next. The law of Kansas must prevail, should it differ from the general law.

VI. We take it that respondent does not seriously contend that the contract of guaranty was not in a strict sense *ultra vires*. The real contention upon their part, as we take it, is that under the facts in this case the defendant is precluded from urging the defense of *ultra vires*. This question is one of Kansas law, as it stands conceded that Kansas law governs this case. A number of Kansas cases are cited, which uphold the general rule that if a corporation receives the benefits of an *ultra vires* contract, it cannot plead *ultra vires* and hold the benefits. In this ruling the Kansas cases are not different from the general law. This doctrine of estoppel is recognized by the Kansas court. [Harris v. Gas Co., 70 Kan. l. c. 752.] In this case it is as well put as in any, although there are others along the same line. In the Harris Case the court says:

"In a larger number of jurisdictions, although the same conception of corporate capacity is adopted, its effect is greatly changed by the application of another principle. Here the courts concede that a corporation has no power to make a contract except such as is conconferred by its charter, expressly or by necessary implication. But they hold that as it must have some discretion in the manner of carrying out the purposes of its creation—some freedom of action—it is amenable to the same rules of conduct as a natural person, and may estop itself to question the validity of an agreement it has assumed to make, or may acquire the right to invoke a similar estoppel in its own behalf. Where this theory is accepted recovery may be had upon a contract which is in fact void, simply because its validity cannot be put in issue. The cases in point are gathered in 29 Am. & Eng. Ency. Law, at page 57, note 1.

"These cases have been criticised for the use they make of the word 'estoppel' as descriptive of the prin-

ciple upon which they are based. It is argued that as a corporation must know the terms of its own charter, and as one dealing with it is charged with like knowledge, neither party to an *ultra vires* contract can be misled in that respect, and therefore there must always be lacking an essential element of what could with technical accuracy be called estoppel. This, however, is a mere question of terminology. The requirement that one shall be consistent in conduct—shall not occupy contradictory positions—shall not retain the advantages of a transaction and reject its burdens—is often spoken of as a form of estoppel. The term is convenient, and, if inaccurate, is not misleading. This rule of estoppel affords a good working hypothesis to accomplish just results. If it fails to accomplish all that might be desired in a practical way it is because it is not made sufficiently far-reaching. It is generally held to be inapplicable to purely executory contracts, one reason stated being that 'where neither party has acted upon the contract, the only injustice caused by a refusal to enforce it is the loss to the parties of prospective profits, and this is too slight a consideration to weigh against the reasons of public policy for declaring it void and not enforceable.' [9 Am. & Eng. Ency. Law, 49.]''

This doctrine is so universal that we need not go into further Kansas opinions. The Kansas rule is not different from the general rule. Under the rule there may be conditions which preclude the plea of *ultra vires*. Whether such is the case is purely dependent upon facts. The only difference between this case and the usual case (recognized by a long line of cases in Kansas) is that it is urged that no direct benefit accrued to the defendant bank. As we gather the situation, it is not seriously contended that if the defendant bank had received the benefits of the bargain (the contract) then it could not plead *ultra vires*.

*Ultra vires* is a two-edged sword. So far as banks are concerned, the public is interested in having them limited to charter powers. On the other hand, equity

says that if you make an invalid contract (a contract *ultra vires*) yet if you get the benefits you cannot claim the literal rule of the law, and escape the contract. So in all these cases of *ultra vires,* there appear the real facts of the particular case. In this particular case, there was an agreement made to give and make these *ultra vires* contracts. This agreement was made between the bank and its prospective customers. The customers said to the bank that we cannot do business without these contracts of guaranty. The bank says to it, We will make them. In broad terms the bank had no right to make a contract of guaranty, yet if it made such contract it might (in view of all the circumstances) be estopped from urging the plea.

Now let us get to the facts of this case. When the guaranty contract sued upon in this case was issued, a course of business had been established. This course of business was outlined to defendant when the Grovier Company first agreed to bank with defendant. The bank then understood that it was to make guaranties, and that it was to receive in consideration therefor a substantial business account. This account was of value, and its value is undenied. This bank knew full well the course of business. It knew that it was protected by a perfectly solvent concern against any loss in the business transactions. It admitted that it was fully protected, in the trial of this case. It appears that pursuant to the contract between the Grovier-Starr-Parvin Company and itself that the bank made the guaranty of the payment of drafts drawn upon such company. The guaranty was made, and upon several considerations, (1) that the bank was to have a valuable account, (2) that the bank would get what would come from such account, which included fees for issuing drafts, and the full advantage of carrying a valuable account. But we have the additional facts, that the produce company, at Hutchinson, Kansas, had agreed to make good any guaranty made, and further that the bank (plaintiff) at Salt Lake City was given to understand that such was the situation.

In fact, the president of the Hutchinson bank said, in he testimony, that he and the co-partners of the produce company had discussed the situation and agreed that the guaranties were without value. This was their judgment of the law. By this we are not bound. But aside from all this we must get down to the position, raised by the record, that there is a state of facts which precludes the defendant from pleading the question of *ultra vires*. On this matter we have the fact that the produce company arranged to have done what was done, (2) that the produce company agreed to stand behind these guaranties, and the defendant accepted such contract, (3) that such contract (according to the proved course of business) was a contract made for the benefit of plaintiff, (4) that all parties acted upon and so understood such contract, (5) that the drafts in question (with the bills of lading) passed through defendant bank, and without the action of the bank as a collector, the produce company could not have gotten possession of the produce, (6) that such produce company (through the action of the bank) did get possession of the produce, without payment, and (7) that the bank has been fully guaranteed from loss, and the suit here is defended by the produce company. All these matters must be considered in determining the question as to whether or not the defendant is justified in interposing the plea of *ultra vires*. As indicated, we do not believe that a Kansas bank, under Kansas law, can issue a pure guaranty to insure the payment of drafts drawn upon it, but we do believe that, under Kansas law, a bank may be estopped from interposing such defense. We also believe in this case that the facts in evidence (especially the one that the bank cannot lose financially) precludes the defense of *ultra vires* in this case.

It is clear that the defendant bank had been secured from the first in making these guaranties, and that such securities must inure to plaintiff bank, which paid out the cash upon the strength of the guaranty obligation.

The judgment is affirmed. All concur.