ILLINOIS LIFE INS. CO. v. TULLY, State Treasurer, et al.

(Circuit Court of Appeals, Eighth Circuit. November 13, 1909.)

No. 2,744.

1. INSURANCE (§ 4*) — INSURANCE COMPANIES — SPECIAL DEPOSITS — KANSAS STATUTES.

Laws Kan. 1871, p. 214, c. 93, regulating insurance companies, as amended by Laws Kan. 1879, p. 225, c. 115, did not require insurance companies organized or doing business in the state to deposit $100,000 of securities with the State Treasurer as a condition to the doing of such business: section 49 of the original act, which alone required such deposit, being expressly repealed by the amendatory act.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 4.*]

2. INSURANCE (§ 4*)—CONTROL AND REGULATION—MUTUAL COMPANIES—KANSAS STATUTES.

Laws Kan. 1879, p. 225, c. 115, relating to insurance companies, and entitled "An act supplemental to and amendatory of chapter 93 of the Laws of 1871," must be construed in connection with the unrepealed portion of the act of which it was amendatory, and, as so construed, neither act applied to mutual or co-operative life insurance companies having no capital stock.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 4.*]

3. INSURANCE (§ 4*)—CONTROL AND REGULATION—SPECIAL DEPOSITS—KANSAS STATUTES.

Gen. St. Kan. 1901, § 3424, which was an embodiment of section 1 of the insurance act of 1879 (Laws Kan. 1879, p. 225, c. 115), and the only statute of the state requiring insurance companies to deposit securities with the State Treasurer, was expressly repealed by Laws Kan. 1903, p. 511, c. 330, § 2, and under article 12, § 1, of the state Constitution, which provides that "corporations may be created under the general laws, but all such laws may be amended or repealed," such repeal was effective and operative as to any insurance company organized under the laws of the state and also as to their stockholders and policy holders, and such com-

panies were no longer required to make such deposits or to maintain deposits previously made under the repealed provision.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 4.*]

4. INSURANCE (§ 679*) — REINSURANCE OF LIFE POLICIES — CONSTRUCTION OF CONTRACTS.

A Kansas mutual life insurance company, then in the hands of trustees appointed by a court, under authority of Laws Kan. 1903, p. 520, c. 336, and by a vote of its policy holders, accepted a proposition made by complainant, an Illinois stock company, to reinsure its policies, and in accordance therewith a contract was entered into and embodied in a decree of the court for such reinsurance, and which provided as a condition thereof that the trustees should assign and transfer to complainant all the assets, securities, and property of every kind of the Kansas company; the decree also authorizing complainant to bring any suits necessary to reduce such assets to its possession. At that time the Kansas company had a large amount in securities on deposit with the State Treasurer, but was not required by the laws of the state to maintain such deposit. *Held*, that there was nothing in the contract which obligated complainant to maintain such deposit; but, on the contrary, it was entitled to recover the securities from the treasurer, who had no authority of law to hold them.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 679.*]

5. INSURANCE (§ 679*)—REINSURANCE OF LIFE POLICIES—CONSTRUCTION OF CONTRACT.

Complainant life insurance company reinsured the policies of a Kansas company which went into liquidation, and by the contract became entitled to possession of all the assets of such company, including a large amount in securities then on deposit with the State Treasurer of Kansas, but without authority of law. Complainant wrote a letter to each policy holder, in which, among other representations, it stated that such deposit would be maintained. *Held*, that such statement did not estop it from afterward withdrawing the securities whether made before or after the contract, since, if before, it was superseded by the contract which contained no such provision, and, if after, it was merely promissory or the statement of an intention.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 679.*]

Appeal from the Circuit Court of the United States for the District of Kansas.

Ancillary bill by the Illinois Life Insurance Company against Mark Tully, State Treasurer of the State of Kansas, and another. Decree for complainant.

Henry W. Price and N. H. Loomis (Charles E. Gault, on the brief), for appellant.

F. S. Jackson (C. C. Coleman, on the brief), for appellees.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

ADAMS, Circuit Judge. In 1903 the Illinois Life Insurance Company, a corporation organized under the laws of that state, reinsured the policies of the Kansas Mutual Life Insurance Company, a corporation organized under the laws of Kansas, and became the purchaser at a judicial sale, made in a suit to wind up the affairs of the latter company, of all its assets. By the decree confirming the sale the assets were required to be turned over and delivered to the purchasing com-

pany, which was authorized and empowered to institute further proceedings if necessary to secure possession of them. The total value of the assets purchased was $775,085.01 as then ascertained and determined. Among and included in them were notes secured by mortgage on real estate and otherwise, amounting to $552,824.46, which had been before then deposited by the Kansas Company with the State Treasurer of that state under a claim that they were lawfully required to be kept there.

In 1905 the Illinois Company, being advised that the claim for the retention of those assets, which the treasurer continued to assert, was unwarranted, obtained leave of court in the main case to file this ancillary bill against the State Treasurer and the State Superintendent of Insurance to secure their possession, and also the possession of about $27,000 more of securities which had been deposited with the treasurer after the purchase was made.

The case was submitted to the trial court on the facts disclosed by the bill and answer, and a decree was entered dismissing the bill on the merits. From this decree complainant appeals.

Presumptively the owner of personal property is entitled to its possession, and, as it is conceded that the Illinois Company acquired title to the securities in question as a part of the assets purchased by it, the burden is on the treasurer to make good his claim to their possession. In the assertion of his claim he contends: First, that the Kansas Company was required by the laws of Kansas to make and maintain the deposits, and that the purchasing company took title thereto subject to that requirement; second, that irrespective of any legal liability the Illinois Company by the provisions of its contract of purchase undertook to maintain the deposits; and, third, that by reason of a circular issued by it to induce the policy holders of the Kansas Company to accept the provisions of the reinsuring contract the Illinois Company is estopped from denying its duty to maintain the deposits.

The Kansas Company was originally organized as a mutual or cooperative insurance company under and pursuant to the laws of that state. On June 25, 1891, it deposited securities of the value of $100,-000 with the State Treasurer under the supposed requirement of an act entitled "An act to establish an insurance department in the state of Kansas, and to regulate the companies doing business therein," approved March 1, 1871, and known as chapter 93 of the Laws of 1871 (Laws Kan. 1871, p. 214, c. 93). Afterwards the Kansas Company continued to deposit securities from time to time with the treasurer in amount equal to the net present value of the policies issued by it pursuant to the supposed requirement of section 1 of "An act supplemental to and amendatory of chapter 93 of the Laws of 1871," approved March 11, 1879 (Laws Kan. 1879, p. 225, c. 115). The amount so deposited, together with the first-mentioned sum, makes the aggregate of $552,824.46 which had been deposited before the reinsurance contract was executed.

A most casual reading of section 48 of the act of 1871, relied upon as authority for the first-mentioned deposit, discloses that it required no deposit whatever of any securities with the State Treasurer. It

dealt exclusively with the amount of capital and the character of investments which an insurance company was required to have before engaging in business. The next section (49) did require the deposit of $100,000 of securities with the State Treasurer as a condition to doing business in the state; but that section was expressly repealed by section 4 of the act of 1879. There was therefore no law requiring either the original deposit or retention of $100,000 of the securities in question.

The treasurer's right to retain possession of the balance of the securities is predicated upon the act of 1879. Does that act justify his claim? It was, as stated in its title, "An act supplemental to and amendatory of chapter 93 of the Laws of 1871," and its provisions must therefore be read and interpreted in the light of all the unrepealed provisions of that act. The act of 1871 was a general law creating an insurance department and regulating all insurance companies, life and fire, doing business in the state. It does not seem to have contemplated or provided for the organization or regulation of mutual or co-operative life insurance companies. The act concerned corporations with capital stock only. This is apparent by the provisions of its sections 45, 46, 48, and 78. Section 45 prescribes that life insurance companies organized under the act shall open their books for subscription to their capital stock. Section 46 provides what shall be done after the capital stock has been subscribed. Section 48 provides that no life insurance company shall be formed or continue in business without a capital of at least $100,000 and unless the full amount of its capital stock shall have been in good faith subscribed, and by section 78 it is expressly enacted that:

"The provisions of this act shall not apply to life insurance companies organized on the co-operative plan."

It being conceded by the pleadings that the Kansas Company was a mutual or co-operative company, it was therefore presumptively not subject to the provisions of the act of 1871, as amended by the act of 1879, requiring the deposit of securities with the State Treasurer.

But if, by the true interpretation of those statutes, the company was required to make the deposits of securities in question with the State Treasurer, we think that requirement was superseded in 1903 by the adoption of the act relating to insurance, approved March 6th of that year. Laws Kan. 1903, p. 511, c. 330. By section 2 of that act, section 3424, amongst others of the General Statutes of 1901, was expressly repealed. The last-mentioned section was word for word the same as section 1 of the act of 1879, which alone provided for the deposit of any securities with the State Treasurer. It was a mere embodiment of that act in the General Statutes.

The result is that the act of 1879, which required not only the depositing of the securities, but imposed the duty upon the treasurer to hold them, was repealed before the contract of reinsurance involved in this case was made. It would unnecessarily prolong this opinion to enter into a discussion of the statutory provisions made for the security of policy holders existing at the time of the repeal of section 3424. It answers our present purpose to observe that the repeal manifests a

clear legislative purpose to change the former policy of the state and to discontinue the requirement for a deposit of securities with the State Treasurer whether that requirement concerned stock companies or mutual companies or any other kind of company whatsoever.

But it is contended that, notwithstanding the repeal of this law, the policy holders existing at the time had acquired a vested interest in the securities being held by the treasurer which could not be affected by the repeal.

Whatever their right in this regard may have been, it was conferred by the statute and by it alone. The Constitution of the state in force at and before the passage of the act of 1879 provided (article 12, § 1) that:

"Corporations may be created under the general laws; but all such laws may be amended or repealed."

Policy holders of a mutual insurance company stand in relation to it much like the stockholders of a stock company to their corporation. They are its members. They are not an independent third party, but are its living and acting members by and through whom the corporate entity acts, and it is only in an academic and technical sense that they are differentiated in theory from the corporation itself. To hold that a legislative regulation of insurance companies, which the exigency of a given time or condition of things requires should be changed, cannot be modified or changed without the consent of their members, would practically defeat all such legislation. The state which gives them being would become powerless to regulate them.

The constitutional power of the Legislature to repeal the law in question must, in our opinion, be held to constitute a condition subject to which not only the Kansas Company accepted its corporate existence, but also subject to which its members entered into relations with it. The latter must have contemplated the possibility of an amendment or repeal of any law affecting their rights when they accepted their policies just as much as the former did when it accepted its life from the state. The following cases are determinative or illustrative of this proposition: Wright v. Minnesota Mutual Life Ins. Co., 193 U. S. 657, 24 Sup. Ct. 519, 48 L. Ed. 832; Venner v. United States Steel Corp. (C. C.) 166 Fed. 1012; Rosenplaenter v. Providence Sav. Life Assur. Soc. (C. C.) 91 Fed. 728; Life Assurance Society v. Welch, 26 Kan. 632; People v. New England Mutual Life Ins. Co., 26 N. Y. 303; Boswell v. Security Mut. Life Ins. Co., 119 App. Div. 723, 104 N. Y. Supp. 130.

Our conclusion therefore is that, whatever be the true interpretation of the prior laws with respect to mutual insurance companies, the obligation to make or maintain the deposits was effectually superseded by the act of 1903, and as a result there was no statutory obligation in force at the time the reinsurance contract was made requiring either the making or retention of the deposits in question obligatory either upon the Kansas Company or upon the Treasurer of the State of Kansas.

But it is contended that the charter of the Kansas Company was amended in 1882 pursuant to the provisions of section 72 of the act of

1871, and that it was thereby brought within and made subject to all the provisions of that act including the amendment of 1879, requiring the deposit of securities with the treasurer. That section is as follows:

"Any life insurance company formed under any law of this state, may amend its charter or articles of incorporation * * * so as to be entitled to all the privileges and subject to all the regulations of this act."

As already observed, the distinguishing feature of insurance companies organized or operated under the provisions of that act was that they should have a capital stock. In order therefore to come within the purview of the enabling statute, the amendment of the charter should have provided, among other things, for the creation of capital stock.

Certainly no express provision of that kind is found in the amended charter before us, and there are many indications that it was never intended by its framers that their company should have any capital stock, or that its members should incur any of the liabilities incident to its possession.

The Constitution of the state of Kansas (article 12, § 2) provides that:

"Dues from corporations shall be secured by individual liability of the stockholders to an additional amount equal to the stock owned by each stockholder," etc.

Article 8 of the amended charter provides that:

"No member of this corporation, except the officers and agents thereof, shall be held personally liable for the losses of or claims against the corporation, and such officers and agents shall be severally liable only for losses arising by reason of their own respective neglect or misconduct."

Here is a distinct and unqualified disclaimer of a liability imposed by the Constitution of the state upon stockholders or corporations having capital stock.

Again, article 2 of the amended charter provides that:

"This corporation shall possess and enjoy all powers, privileges and franchises belonging to, and shall be subject to all restrictions, regulations and obligations resting upon corporations, organized or existing under the act passed by the legislature of the state of Kansas entitled 'An act to establish an insurance department in the state of Kansas, and to regulate the companies doing business therein,' which act took effect March 24, 1871, and all acts passed or to be passed, in amendment thereof or supplemental thereto, so far as applicable to the organization and nature of a mutual life insurance association."

Here is found a clear and distinct disavowal of any purpose to change from a mutual to a stock company.

The Kansas Company, after the adoption of its amended charter, still remained a mutual or co-operative insurance company as before, and as such was by the express provisions of the law, as well as by its necessary implications, not subject to the requirement to deposit any securities with the state treasurer.

Did the contract of reinsurance obligate the Illinois Company to maintain the deposits with the treasurer?

We must approach a discussion of this question in view of the law

as already declared; that there was no legal liability on the part of the reinsured company to make or maintain the deposits, and in determining the force and meaning of the contract the decree of court authorizing and confirming it, as well as the written document itself, should be considered.

At the time of negotiating the contract, the Kansas Company was in the hands of trustees appointed by the court below in a proceeding instituted for the purpose of annuling a former reinsurance contract, made between it, and the Kansas Union Life Insurance Company and to secure a reorganization of the first-mentioned company; and the proceedings, resulting in the contract of reinsurance now under consideration, were had in that case.

By section 3 of an act of the Kansas Legislature entitled "An act relating to mutual or co-operative life insurance companies," approved March 10, 1903 (Laws Kan. 1903, p. 521, c. 336), it was provided that:

"Whenever the directors of any mutual or co-operative life insurance company or association organized under the laws of the state of Kansas shall deem it to the best interests of the policy holders to suspend business, it may secure propositions from other solvent life insurance corporations authorized to do business in the state of Kansas, whether foreign or domestic, and whether companies possessing a capital stock or organized on the mutual plan, to reinsure its policies, that upon securing such proposition or propositions the same shall be formulated and the substance transmitted by mail to each policy holder, and a regular or special meeting of the policy holders shall be called for the purpose of determining whether said company shall go into liquidation, and also of voting upon said proposition of reinsurance. If at such meeting two-thirds of the number of the holders of outstanding policies of such company or association shall vote, either in person or by proxy, to go into liquidation and to accept any one of said propositions for reinsurance, the board of directors may make a contract in accordance therewith, and upon due execution thereof transfer and turn over to the said reinsuring corporation so much of the assets of said mutual or co-operative insurance company or corporation as are embraced in said proposal or contract as consideration therefor; provided, that any dissenting policy holder may withdraw his equitable share of the assets of said corporation in lieu of accepting said reinsurance contract.  *  *  *"

By section 4 of that act it was provided:

"That if any mutual or co-operative life insurance company or association is now or shall hereafter be in the hands of receivers or trustees appointed by any court of competent jurisdiction, the said receivers or trustees shall exercise the functions and perform the duties of directors as prescribed by section 3 of this act and execute the contract therein referred to."

The parties to that suit invoked the provisions of this law to bring about a liquidation of the Kansas Company and a reinsurance of its policies. The trustees exercising the function of directors, as authorized by section 4, invited and received propositions from other companies, including the Illinois Company, which was an old line stock company. The substance of these propositions was transmitted by mail to each policy holder, and afterwards at a meeting duly called and held it was resolved, by a vote of more than two-thirds of all of them, to go into liquidation and accept the reinsurance proposition of the Illinois Company. The equitable share of the assets belonging to the different policy holders was ascertained by actuaries appointed for that purpose, and the contract was duly executed and delivered. Any

dissenting policy holder had the right to and did withdraw his equitable share of the assets instead of accepting the reinsurance provided by the contract.

Acting on the assumption that it had lawfully amended its charter in 1882, the Kansas Company thereafter ceased to do business on the assessment plan as it had done before and undertook to convert its policies into fixed or level premium policies with participation in surplus earnings, and the practice of assessing premium notes given by the members to meet death losses, which before then had prevailed, was abandoned. An organization without capital stock unwarranted by law, as already seen, resulted; but, whether warranted or unwarranted, it, acting as a de facto corporation, issued certain classes of policies and undertook in consideration of the receipt of certain premiums in cash to insure the lives of individuals.

It was in view of this condition of things, doubtless, that the following covenant was inserted in the reinsurance contract:

"And it is further understood and agreed that the Illinois Life Insurance Company shall not interpose any defense to any policies issued by the Kansas Mutual Life Insurance Company, commonly known as the Old Line Level Premium Legal Reserve policies, or policies of any other kind or class, which are not within the terms of chapter 131 of the Laws of 1885 upon the ground of the lack of power of the Kansas Mutual Life Insurance Company to issue the same."

For the purposes of this case we find it unnecessary to give special attention to the different classes of policies or the peculiar rights and privileges accorded to each class. They were all reinsured by the Illinois Company, and the payment of them, whether issued lawfully or unlawfully, was the consideration for the transfer of the assets to the Illinois Company. The obligation of the latter company with respect to maintaining the deposits in question with the treasurer depends, not upon the rights of individual policy holders, but upon what it agreed to do in that respect in and by the reinsuring contract.

The deposits then amounted to about five-sevenths of all the assets sold to the Illinois Company, and it would seem, if such a substantial part of them were not to be actually delivered to the purchaser, but were to be detained in the custody of an officer not authorized by law to hold them as we have already determined, and therefore not responsible on his official bond for them, that it was such an important feature of the transaction as naturally would be specifically provided for in the contract. But the contract is silent on this subject. That is not all. In explicit language it requires the trustees of the Kansas Company "to transfer to said Illinois Life Insurance Company, immediately, by delivery thereof and by proper deeds of assignment and transfer, all the assets, money, notes, bonds, mortgages, stocks, securities, judgments, choses in action, real property and property of every kind and character and wheresoever situated, belonging to said the Kansas Mutual Life Insurance Company on the day this contract goes into effect." Again, it provides that it shall go into effect and be binding "only when all the transfers, assignments, and deliveries herein mentioned shall have been duly made, and not before." Again, the decree in which the contract is bodily incorporated authorized the

purchaser to bring suit or suits for the collection of claims due to the Kansas Company "and to take any lawful action whatever to realize upon or to reduce to its control or possession, the assets transferred to it, as aforesaid."

Applying all the tests known to the law for ascertaining the intention of contracting parties, which is the final and conclusive criterion for determining the true construction of a contract, it cannot be doubted that the true intent and meaning of the reinsuring contract was to give the right of immediate possession of the deposits in question to the Illinois Company.

As a step in the reinsuring process marked out by the provisions of section 3 of the act of 1903, supra, to which resort was had in this case, the Kansas Company was liquidated. Its obligations under the law ceased. The Illinois Company not only assumed the obligations and duties specified in the reinsuring contract, but all other obligations and duties imposed upon foreign corporations by the laws of the state of Kansas as well as those incumbent upon it incident to its own creation and existence under the laws of the state of Illinois.

It was an old line stock company, and as such afforded a security for its policy holders different but no less effectual than the mutual company was required to do by the laws of Kansas. Its capital and surplus, the deposit of $100,000 which the law of Illinois required to be kept intact with the State Treasurer of that state, and other statutory provisions for the security of its policy holders, together with the visitorial and corrective subjection of the company to the commissioner of insurance of the state of Kansas, all furnished such protection to its policy holders as rendered unreasonable the requirement that a large part of its assets should be sequestered in a foreign state and made subject to the burden of its taxation and control. In view of this ample provision for their security, the policy holders of the Kansas Company with great unanimity devoted the equitable value of their share of the assets belonging to their own discredited company to the purchase of new insurance in the solvent and reliable Illinois Company. This was done according to a scheme which their officers had devised and which they had approved. The transaction amounted to a complete novation of the obligations of the Kansas Company. It was released from liability, and the Illinois Company assumed that liability on terms proposed to and accepted by the policy holders. Neither the law of Kansas nor the contract in any rational interpretation of it required the retention of the deposits in question, and they afford no authority for the treasurer's present contention.

This brings us to the last proposition of the treasurer, namely, that the Illinois Company is estopped from denying its obligation to maintain the deposits with him by reason of a certain circular letter alleged to have been "made and prepared" by the Illinois Company. That letter is as follows:

"Chicago, June 26, 1903.

"Dear Sir: The Illinois Life Insurance Company begs to announce that in pursuance of the acceptance of its proposition to assume and reinsure the policies of the Kansas Mutual Life Insurance Company by the unanimous vote of a meeting of the policy holders held on the 17th day of June, 1903, the reinsurance of the Kansas Mutual Life Insurance Company by the Illinois Life

Insurance Company was perfected, and you are therefore now a policy holder of the Illinois Life Insurance Company. Under the terms of the contract of reinsurance, your policy is assumed by the Illinois Life Insurance Company and will be carried out as provided in said contract of reinsurance without subjecting you to any medical examination and without change of your policy. In other words, you retain your old policy. The Illinois Life will increase the importance of the Topeka office, and will make it the medium of loaning largely of the company's assets upon Kansas farm mortgages. The present Kansas mortgage loans will be continued, and they, together with the additional loans contemplated, will make the Topeka office the most important office of the company in point of mortgage investments. The assets now on deposit with the Treasurer of the State of Kansas for the protection of the reserve on outstanding policies will be continued, and the amount of this deposit will be increased from time to time, so that the entire reserve on registered policies may be maintained intact. The sworn statement of the Illinois Life to the various insurance departments shows its net admitted assets on December 31st last were over $4,000,000, and its insurance in force over $30,000,000. In April, 1903, this company was examined by the Kansas insurance department, and its statements verified and approved. By the reinsurance of the Kansas Mutual, its policy holders are given the additional security of the entire assets and surplus of the Illinois Life, thus securing their policy contracts beyond all peradventure. The consolidation of the business of the two companies will result in saving in salaries, state license fees, taxes, and other expenses, amounting to many thousands of dollars per year. So that the consolidation of the two companies will greatly redound to the advantage of all the policy holders. It will be the aim and desire of the management of the Illinois Life Insurance Company to please its policy holders, because its primary purpose is their protection and welfare, and the management will always deem it a pleasure to receive such suggestions for the benefit of the company as may be presented by its policy holders. As an evidence of the reinsurance which has been effected, we beg to inclose herewith our formal certificate of reinsurance, which you will please attach to your policy and sign and return to this office, in the inclosed stamped envelope, and receipt therefor.

"Respectfully yours,                Illinois Life Insurance Company."

It must be assumed from the undisputed allegations of the answer that this letter was distributed to the policy holders of the Kansas Company; but when it was so distributed, with reference to the time of complete novation of liability from the Kansas Company to the Illinois Company on the policies of the former company, does not appear.

As far as this record discloses, the letter was not sent to or did not reach any of the policy holders before they had irretrievably surrendered their claim against the Kansas Company and accepted the obligation of the Illinois Company. They therefore could not have changed their position in reliance upon it.

The law is well settled that a party, in order to invoke an estoppel by reason of the conduct of another, must have acted upon material representations made by the latter at a time and under circumstances when he had a right to rely upon them, and must have been injured as a consequence of such innocent and justifiable reliance. The treasurer, assuming to act in the interest of the policy holders, invokes such an estoppel to protect himself in the retention of the deposits. The affirmative therefore was on him to establish all the facts entitling him to the protection of this principle. He does not seem to have done it.

But passing this somewhat technical aspect of the subject, and conceding, but not finding, that the circular was distributed amongst the policy holders dum fervet opus, and that they had the circular before them while considering the proposition of the Illinois Company (and this is as broad an assumption as the facts of the case under any aspect could warrant), would the dissemination of such a circular under such circumstances estop the Illinois Company from now taking possession of the deposits in question?

We think not for two reasons: First, because the representations contained in the circular were not representations of fact, but were expressions of intention concerning the future policy of the Company. The circular first assumed a complete and finished novation by the policy holders. It says:

"You are therefore now a policy holder of the Illinois Life Insurance Company. * * * Your policy is assumed. * * * As an evidence of the reinsurance which has been effected, we beg to inclose herewith our formal certificate of reinsurance, which you will please attach to your policy and sign and return to this office. * * *"

It then proceeds to state what the company expects to do. It says:

"It will be the aim and desire of the management of the Illinois Life Insurance Company to please its policy holders. * * * The consolidation of the business of the two companies will result in saving in salaries, state license fees, taxes and other expenses, amounting to many thousands of dollars per year. * * * The Illinois Life will increase the importance of the Topeka office, and will make it the medium of loaning largely of the company's assets upon Kansas farm mortgages. The present Kansas mortgage loans will be continued, and they, together with the additional loans contemplated, will make the Topeka office the most important office of the company in point of mortgage investments."

In the midst of such promissory statements as these is found the one relied upon by the treasurer, as follows:

"The assets now on deposit with the Treasurer of the State of Kansas for the protection of the reserve on outstanding policies will be continued, and the amount of this deposit will be increased from time to time, so that the entire reserve on registered policies may be maintained intact."

It cannot be doubted that all the other representations are so clearly of future intentions and purposes as to form no basis for the doctrine of estoppel. The promise to "aim to please" the stockholders and to "increase the importance of the Topeka office," and other like things, formed a species of innocent buncombe and pretension upon which no right of action could be predicated, and we think the representation relied upon is of the same general character, and in its interpretation the maxim noscitur a sociis ought to apply. It was only the expression of a present intention liable to be changed as circumstances and the future interests of the company might from time to time require.

Estoppel cannot be predicated upon mere promises, expressions of intention, expectation, hope, or belief.

In the case of Farwell v. Colonial Trust Co., 147 Fed. 480, 78 C. C. A. 22, this court had under consideration the rescission of a contract based on alleged false representations. In other words, a right

was there asserted of kindred nature to that which is now invoked. We there, speaking by Judge Sanborn, said:

"The subject of such misrepresentations must be the existence or nonexistence of facts at the time the statements were made. Neither promises, nor prophecies, nor expressed opinions or beliefs. concerning future events or conditions, will sustain a rescission of a contract or a sale."

In Jackson v. Allen, 120 Mass. 64, 79, Mr. Justice Gray, then Chief Justice of the Supreme Judicial Court of Massachusetts, speaking for that court, said:

"To constitute an estoppel in pais, it is essential that the defendant should, by word or act, have represented the fact to be different from what he now attempts to show it to have been. Mere disappointment in expectation, or breach of promise or covenant relating to the future, cannot constitute an estoppel in pais."

In Insurance Company v. Mowry, 96 U. S. 547, 24 L. Ed. 674, Mr. Justice Field, speaking for the Supreme Court, said:

"An estoppel from the representations of a party can seldom arise, except where the representation relates to a matter of fact—to a present or past state of things. If the representation relate to something to be afterwards brought into existence. it will amount only to a declaration of intention or of opinion, liable to modification or abandonment upon a change of circumstances of which neither party can have any certain knowledge. The only case in which a representation as to the future can be held to operate as an estoppel is where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act."

In Sawyer v. Prickett, 19 Wall. 146, 22 L. Ed. 105, it is said:

·"It is difficult to see how an action or a defense can be based upon promissory representations of the character we have considered, and we are of the opinion that they were the expressions of hopes. expectations, and beliefs. and that neither party understood, or had the right to understand, that they were to be received as statements of facts which any one was bound to make good, or upon which the validity of the subscription should depend."

Bigelow, in his work on Estoppel ([5th Ed.] p. 574), says:

"The representation or concealment must, in the second place, like a recital, in all ordinary cases have reference to a present or past state of things; for, if a party make a representation concerning something in the future, it must generally be either a mere statement of intention or opinion, uncertain to the knowledge of both parties, or it will come to a contract, with the peculiar consequences of a contract."

The "peculiar consequences" just referred to undoubtedly mean that the contract, if made, would merge the representations which might have induced its execution.

The second reason why the dissemination of the circular cannot sustain the treasurer's contention is this: On the assumption, which we are now indulging, that the circulars were distributed before the policy holders had finally determined to accept the reinsurance and while the negotiations to that end were pending, we are confronted with the well-established legal principle that the contracts as finally concluded superseded all the former representations on the subject.

Mr. Justice Field, in Insurance Company v. Mowry, supra, made the following observation:

"But the doctrine (of estoppel) has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the

person complaining is to be a party. He has it in his power in such cases to guard in advance against any consequences of a subsequent change of intention and conduct by the person with whom he is dealing. For compliance with arrangements respecting future transactions, parties must provide by stipulations in their agreements when reduced to writing. The doctrine carried to the extent for which the assured contends in this case would subvert the salutary rule that the written contract must prevail over previous verbal arrangements, and open the door to all the evils which that rule was intended to prevent."

We think the doctrine of that case has pertinent application to this. Whether the deposits amounting to nearly all the assets of the Kansas Company should be retained in the possession of the treasurer as security for the policy holders of that state was, as now appears in this case, a matter of grave concern and importance to them. Yet when two-thirds of the policy holders approved the reinsurance contract as proposed by the Illinois Company, and when the balance of them accepted a novation of the old company's obligation and took their insurance from the Illinois Company pursuant to the terms of the contract, instead of taking (as they might have done) their equitable share of the assets of the Kansas Company, they thereby determined that, notwithstanding the want of any provision in the contract of reinsurance for the treasurer's retention of the deposits, they would avail themselves of the reinsurance as proposed by the Illinois Company. They had opportunity to determine their action in view of the fact that there was no provision requiring the retention of the deposits by the treasurer and did so. To hold that they can now avail themselves of the representations contained in the circular, to enforce an obligation which in their final contract they made no provision for and were content without, would destroy the sanctity and conclusiveness of the written contract and open it to considerations which were the subject of negotiation, but which were not deemed important enough to embody in the concluded contract. This cannot be done.

We have assumed, as was apparently done below, that the treasurer was the trustee for or stood in such privity with the policy holders as to be entitled to make any defense to this action which they might have made had they been made parties to it. But in view of the conclusions already reached that he is a mere volunteer, a bailee assuming to act without authority of law or contract, it is questionable if he can invoke for his justification in this case any of the rights of the policy holders. But as it is unnecessary to decide this we refrain from expressing any opinion concerning it.

The decree of the Circuit Court must be reversed, and the cause remanded, with directions to enter one in favor of the complainant as prayed for.