THEODORE G. RECHOW v. BANKERS LIFE COMPANY, a Corporation, Appellant.—73 S. W. (2d) 794.

Division Two, July 9, 1934.

*F. M. McDavid, O. O. Brown, R. B. Alberson* and *Emory M. Nourse* for appellant.

*Theodore G. Rechow* and *Herman Pufahl* for respondent.

COOLEY, C.—This is an action at law for damages for alleged breach of a contract of insurance. Plaintiff, claiming that defendant had violated its contract, sued to recover assessments he had paid, with interest thereon. By agreement of the parties the cause was tried to the court without a jury, resulting in a finding and judgment for plaintiff for $1550.83, from which judgment defendant appealed. The appeal was granted to the Springfield Court of Appeals. That court, deeming itself without jurisdiction of the appeal, transferred the cause to this court. Defendant in its answer had pleaded as *res adjudicata* of the matters urged by plaintiff in his petition a judgment of the District Court of Polk County, Iowa, affirmed by the Supreme Court of that state, and that under Section 1 of Article IV of the United States Constitution the courts of this State are bound to give full faith and credit to such Iowa judgment and decision, giving thereto the same force and effect they would have in said sister state. We think, as did the Court of Appeals, that a constitutional question is presented, giving this court appellate jurisdiction. [See Barber v. Hartford Life Ins. Co., 269 Mo. 21, 187 S. W. 867.] That case was reversed by the United States Supreme Court in Hartford Life Ins. Co. v. Barber, 245 U. S. 146, holding that this court had failed to give full faith and credit to a Connecticut decree therein pleaded but such reversal does not affect the question of our appellate jurisdiction. The constitutional question was timely raised and has been kept alive.

Defendant is an Iowa corporation licensed to do business in this State. Its home office is at Des Moines, Iowa. It was organized about 1879 pursuant to the laws of Iowa under the name "Bankers Life Association," as an assessment insurance association or company and until October, 1911, was authorized to and did issue contracts of insurance only on the assessment plan. The certificates issued by the association admitting the recipients to membership in the association and evidencing the contracts of insurance were each for the sum of $2000 and were all alike, all certificate holders or members belonging to one class. By the terms of the certificate the application therefor

and the articles of incorporation and by-laws of the association were made part of the contract. Upon becoming a member of the association and receiving a certificate the member paid one dollar for each year of his age, which went into a fund designated the guarantee fund. If a member died in good standing this contribution to the guarantee fund was to be paid to his beneficiary, together with the $2000 called for by his certificate. If he at any time forfeited his membership and certificate the sum he had paid into the guarantee fund was forfeited and thereupon went into a fund called the reserve fund, later by amendment to the by-laws designated as the surplus fund which, by the by-laws, was "set apart as an emergency fund for the purpose of providing for death losses in excess of one per cent per annum of the membership of the association, and for the further purpose of advances for the payment of death losses when the benefit fund is exhausted." This benefit fund is often referred to in the record as the emergency fund. Said fund was to consist of lapsed or forfeited guarantee deposits, as above indicated, and "the interest accruing from all funds of the association of whatever nature; all gains, discounts, and margins realized on sale of bonds and mortgages and on real estate, taken on foreclosure or otherwise, and all unused surplus arising from the contingent fund and all other sources." The contingent fund was a fund out of which the expenses of transacting the business were paid and was provided by a certain "membership fee" paid by each member on his admission in addition to his contribution to the guarantee fund and an "annual tax," at first six per cent, later increased to ten per cent, of the amount contributed to the guarantee fund, which tax was to be collected in such installments and at such times as directed by the board of directors.

The articles of incorporation and by-laws provided for a fourth fund, called the benefit fund, out of which death losses should be paid and which should consist of "all moneys collected for the payment of losses occasioned by the death of members of the association and shall be collected by *pro rata* assessments levied by the board of directors upon the guarantee fund of the association," that is, by assessments upon the members made in proportion to the amounts contributed by them to the guarantee fund, based upon age at entrance. The certificate on its face provided that "the amount due under this contract to be provided for by assessment on the membership levied *pro rata* upon the guarantee fund of the association, unless otherwise supplied." We understand "otherwise supplied" meant supplied from the emergency fund as above indicated in certain contingencies. The association had no means of paying death losses except by assessments levied upon the membership. Assessments were not fixed in amount by the contract but depended upon the amount necessary to meet

the death losses. They were levied quarterly, payable in January, April, July and October of each year. By the terms of the contract failure to pay any assessment when due forfeited the delinquent's membership and his contribution to the guarantee fund and all rights under his certificate.

In 1907 the Iowa Legislature enacted statutes forbidding the writing of assessment insurance except by fraternal beneficiary associations and by companies or associations previously authorized to write such insurance (as was the Bankers Life Association) and authorizing such latter companies or associations, by proceeding as therein provided, to transform themselves into "legal reserve or level premium" companies and thereafter to transact business as such legal reserve or level premium companies. As construed by the Supreme Court of Iowa in Wall et al. v. Bankers Life Company, 208 Iowa, 1053, 223 N. W. 257, those statutes authorized such companies or associations when they so transformed themselves into legal reserve or level premium companies to cease writing assessment insurance. They were required, however, to carry out existing contracts. Acting under that statutory authority and in accordance therewith the Bankers Life Association, in October, 1911, did transform itself into a legal reserve or level premium mutual life insurance company and changed its corporate name to Bankers Life Company. It thereupon ceased writing assessment insurance and thereafter issued only level premium or "old line" policies. When it made the change all certificate holders were notified thereof and given opportunity, even solicited, to exchange their certificates in the old assessment association for insurance on the level premium plan and many did so. Others, including plaintiff, declined because, especially for the older members, the rates under the level premium plan were higher than their assessments had amounted to up to that time under the assessment plan. By reason of such transfers and the fact that no new members were coming into that class the number of assessment members naturally dwindled. After the change of October, 1911, in the kind of insurance written the reserve or emergency fund was gradually and increasingly drawn upon to meet death losses in excess of one per cent per annum among the assessment members until by the early part of 1927 that fund was exhausted. It then became necessary to make a sharp increase in mortuary assessments in order to pay death losses among the assessment members. Until the Wall case was decided in January, 1929, the company had been crediting to the emergency fund for the benefit of assessment members a portion of the money paid in as premiums by level premium policyholders, a practice held illegal in the Wall case and, as we understand the record, thereafter discontinued. The level premium policyholders were, however, never assessed for mortuary losses occurring among the assessment members

and the amount taken from their premium payments and credited to the emergency fund, varying under amendments of the by-laws after the transformation in 1911, was never sufficient, together with the other accretions to that fund, to keep it intact. The assessments for mortuary purposes, though varying somewhat, remained fairly uniform from the time plaintiff became a member until the 1911 reorganization. After that and until the exhaustion of the emergency fund they were somewhat higher, though not alarmingly so, and still fairly uniform. Beginning about with assessment No. 176, due in April, 1927, when the emergency fund was practically exhausted, they became very much higher. Plaintiff paid assessments 176 to 182 inclusive under protest. He refused to pay assessment 183 and sued to recover the assessments he had paid with interest from the respective dates of payment.

In his petition plaintiff pleads the incorporation of the Bankers Life Association and its authority to do business as "a life insurance company on the assessment plan;" the issuance of his certificate; the by-laws establishing the four funds above mentioned and that the articles of incorporation and by-laws of the association formed part of his contract; the payment by him of all dues and assessments to and including 182 and the amounts thereof; that in October, 1911, defendant changed its name to the Bankers Life Company and ceased writing insurance on the assessment plan and thereafter wrote insurance on the level rate plan only; that as soon as he learned that defendant had so ceased to write assessment insurance and would write only level rate premium insurance he realized that if persons then holding assessment insurance certificates were to be placed or left in a class by themselves for assessment purposes it would destroy the value of their insurance because of the necessarily resulting increase in assessments to meet death losses and that, desiring to know whether or not persons thereafter insuring would be assessed or their premium used to help pay death losses among the "persons who were already members" (the assessment members), he wrote the company to learn his status and to learn whether the assessment members were to be put in a class by themselves for assessment purposes; that in response to such inquiry he received a letter from defendant, dated December 8, 1911, informing him that contracts previously made would be carried out according to their terms and that the then present members would not be put in a class by themselves for assessment purposes. The petition then alleges that said letter "construed said certificate and said contract of insurance to mean and did mean that death losses would be apportioned throughout the entire membership of those who held certificates on the assessment plan and those who became members and who would hold certificates under the level rate plan," and to mean also that the emergency fund could

not and would not be drawn upon until the death rate of the "entire membership," including those paying level premiums, exceeded one per cent of such entire membership and "said fund was applicable and available for the payment of assessment members (numbers?) 176, 177, 178, 179, 180, 181, 182 and 183;" that said assessments were illegally made "for the reason that such assessments were based upon the death rate of the assessment members alone;" that he relied upon the representations and assurances so made to him by defendant and therefore continued to pay all assessments thereafter made which he would not have done but for such assurances; and that defendant is estopped as to plaintiff "from denying that the contract of insurance was and is as interpreted by it."

The petition then pleads that until assessment 176 was levied in March, 1927, plaintiff did not know that any assessments had been made otherwise than upon the "entire membership," including holders of level premium policies; that the death rate had never been one per cent of such entire membership in any one year, wherefore no part of the emergency fund could properly have been used to pay death losses; that he paid assessments 176 to 182 inclusive, aggregating $169.05, under protest; that he refused to pay assessment 183, due in January, 1929, because of which refusal defendant had declared his membership and certificate forfeited. The petition then states the claimed breach of contract and the grounds on which plaintiff seeks recovery thus:

"The plaintiff states that all the assessments from 176 to 183 were grossly excessive and void because they were based on the death rate of the assessment (members) and were made in violation of the contractual rights between the plaintiff and defendant under the certificate of insurance.

"The plaintiff states that the defendant company breached and violated its contract with the plaintiff in this:

"That it placed all of the assessment members and persons who held certificates or contracts under the assessment plan in a class by themselves for assessment purposes and did not apportion the death losses throughout the entire body of the persons insured in the defendant company whether they were insured on the assessment plan or basis or legal reserve plan or basis, but levied the assessments only on those members of the company carrying insurance on the assessment plan in violation of its contract of insurance and said certificate and agreement with plaintiff.

"That the defendant did not proportion the total death losses throughout the entire membership of the members holding certificates on the assessment plan and members holding certificates under the level rate plan.

"The plaintiff states that on account of the breaches of said con-

tract of insurance as contained in said certificate as hereinbefore alleged and on account of misrepresentations in inducing the plaintiff to pay the assessments since 1911 and in placing the assessment members of the company in a class to themselves for assessment purposes the defendant company is indebted to plaintiff for all sums of money that he has paid to the defendant since the issuance of his certificate which in the aggregate amounts to Fifteen Hundred Dollars. . . ."

Defendant's answer need not be epitomized. It sufficiently meets the issues presented by the petition. It pleads at some length among other things the history of defendant and its transformation from an assessment association to a legal reserve level premium mutual insurance company and the Iowa statutes and decisions authorizing such transformation; and further pleads the judgment of the District Court of Polk County, Iowa, and the decision of the Iowa Supreme Court affirming it in Wall et al. v. Bankers Life Company, supra, as res *adjudicata* of the matters relied upon by plaintiff and that under the full faith and credit provision of the Federal Constitution such judgment and decision must be given the same force and effect by the courts of this State as they have in Iowa.

As we view this case there are, under the pleadings, but two legal questions presented: First, was assessment No. 183; which plaintiff refused to pay and because of which refusal his insurance lapsed, excessive and illegal for the reason asserted in his petition; if not, then, second, was defendant nevertheless estopped from demanding it and treating the insurance as forfeited for plaintiff's refusal to pay it because of the letter written to plaintiff December 8, 1911.

On the first question it is apparent from plaintiff's petition that he therein challenges assessment 183 as excessive and illegal on only one ground, viz., that it was not levied proportionately upon what he terms the entire membership of the company, including holders of level premium policies, but only upon those holding certificates, such as his, issued for insurance on the assessment plan. For that reason alone he asserts the assessment was excessive and void. Plaintiff having thus defined and limited his complaint on this point we shall confine our consideration of the question to the ground so relied upon.

The case of Wall et al. v. Bankers Life Company, supra, urged by appellant as decisive of this question, was a suit in equity. It was instituted in the District Court of Polk County, Iowa, a court of general jurisdiction, about March, 1927, by Joseph Wall and a number of others, suing on behalf of themselves and "all other persons similarly situated willing to join herein and help bear the expense thereof," against this defendant, the Bankers Life Company. Soon after suit was filed the petition therein was amended by striking out the words "willing to join herein and help bear the expense thereof," thus leaving it declaring that plaintiffs sued for themselves and "all

other persons similarly situated.'' About the same time William A. Lindley and others, also suing for themselves and all others similarly situated, brought a similar suit against this defendant, as did also Curtis Boughton. The three suits, each presenting substantially the same issues, were consolidated and tried as one action. All of the plaintiffs were holders of similar assessment certificates issued by the association prior to its transformation into a legal reserve or level premium company. Before trial two or three groups of persons, comprising in all seven or eight hundred residing in various states, all holding like certificates, were permitted to file intervening petitions in which they purported to intervene for themselves and others similarly situated. They took substantially the same position as that of the plaintiffs in the three suits mentioned. Those actions sought. among other things an accounting by the defendant as to the guarantee, reserve and contingent funds above mentioned and the money alleged to have been taken from those funds, that the defendant be restrained from raising the assessment rates and that it be required to levy assessments for death losses upon the entire membership of the company including those to whom level premium policies had been issued after the reorganization of October, 1911. The right of the defendant to levy assessments to pay death losses among the assessment members upon the members of that class alone was challenged as it is in the instant case and the court was asked, on that ground among others, to declare assessment 176 illegal and to enjoin its enforcement. Said assessment 176 had been made and was then due. It was made in the same manner and on the same basis as assessment 183 here in controversy. While the action was pending and before trial assessment 177, also made in the same manner and on the same basis, became due and the question of its validity was brought into the case and litigated. In the trial the affairs of the organization, its methods of transacting business, the handling of its funds and its methods of making assessments, before and after the reorganization of October, 1911, as well as the reasons for and the effect of said reorganization, were fully gone into. The trial court held that the funds had all been properly handled and administered and that assessments 176 and 177 had been properly and legally made in the manner required by the assessment contracts, articles of incorporation and by-laws and that the certificate holders who had failed to pay said assessments had forfeited all rights under their certificates. The court also found that said actions had been brought and prosecuted in good faith and that there had been no collusion between any of the petitioners or interveners and the defendant; a finding that appears to us to have been well sustained by the evidence, which is set out in the abstract of record herein. On appeal to the Supreme Court of Iowa that court in an exhaustive and well con-

sidered opinion, affirmed the judgment of the district court. In both courts the three actions, consolidated, were treated as one case. For convenience we refer to it as the Wall case. The petitioners and interveners therein appealed from the judgment of the Iowa Supreme Court to the United States Supreme Court where the appeal was dismissed for want of a substantial Federal question. [Wall et al. v. Bankers Life Co., 282 U. S. 808.] Without going further into detail as to the issues presented in the Wall case it may be confidently stated that the question now under consideration, viz., the right of defendant company to levy assessments for death losses occurring among assessment members upon the members of that class alone, as is herein complained of regarding assessment 183, was presented and adjudicated in the Wall case and the validity of assessments so made was upheld.

The record herein shows that assessment 183 was made in the same manner and upon the same basis as assessments 176 and 177 assailed in the Wall case. Plaintiff in his petition asserts that assessments 176 and 177 and all others up to and including 183 were excessive and illegal for the same reason, viz., because they were ''based upon the death rate of the assessment members alone.'' If assessments 176 and 177 were valid as against that objection, necessarily so also is assessment 183. Respondent insists that the determination of that question in the Wall case, if it was there determined contrary to his contention herein, should not be given effect against him because: He was not a party to that suit and did not appear therein; it was a different form of action, being an action in equity while his case is one at law for breach of contract; and it did not involve assessment 183 here in question but assessments 176 and 177 which he paid and which therefore are not now in issue. We think those contentions are determined adversely to respondent in Hartford Life Ins. Co. v. Ibs, 237 U. S. 662.

The Ibs case originated in Minnesota. It was a suit at law brought by the beneficiary, widow of the insured, to recover the amount claimed to be due on an assessment insurance certificate or policy upon the death of the insured certificate holder, against the Hartford Life Insurance Company, a Connecticut corporation, which had issued the certificate. The company defended on the ground that the policy had been forfeited by the failure of the insured to pay a certain assessment levied to meet 145 claims which had matured during the preceding quarter, to which the plaintiff replied that most of the claims had been paid during the quarter and that at the end thereof there was sufficient money in the mortuary fund to pay the remaining claims, for which reason the assessment in question was unnecessary and void. In answer to that contention the company asserted that the fund was maintained as a source from which to make prompt

settlement of claims, but that such advances did not prevent the levy of the quarterly assessment in controversy which when collected was to be used to replenish the fund. In support of that defense the company offered a certified copy of the decree of a Connecticut court, in the case of Dresser and Other Certificate Holders v. Hartford Life Ins. Co., in which it was adjudged that the company had the right to maintain and use the fund. The plaintiff objected to the admission of the decree on the ground, among others, that she was not a party to the proceeding in which it was rendered. The trial court sustained her objection and directed a verdict in her favor. The Minnesota Supreme Court affirmed the judgment and the case was taken to the United States Supreme Court on a record presenting the sole question as to whether the Minnesota courts had failed to give full faith and credit to the judicial proceedings of the state of Connecticut. The certificate sued on in the Ibs case had been issued to Herman Ibs in 1885, naming his wife as beneficiary. In 1908 the company ceased writing assessment insurance. Soon thereafter one Dresser and thirty other assessment members residing in different states brought suit in a Connecticut court "in their own behalf and on behalf of all others similarly situated." Herman Ibs was not a party to that suit nor was his wife. The Connecticut decree was rendered March 23, 1910. The assessment which Ibs failed to pay, for which failure his certificate was canceled on June 23, 1910, was made May 2, 1910, as of March 31, 1910, and should have been paid by June 20. Ibs died June 27, 1910. It is obvious that the particular assessment, for failure to pay which Ibs' certificate was forfeited, could not have been before the Connecticut court in the Dresser case. Before the final decree was rendered in that case (the decree which the Minnesota court excluded) there had been a judgment rendered by the Connecticut court and reversed on appeal by the Supreme Court of that state. [80 Conn. 681.]

In Hartford Life Ins. Co. v. Ibs, supra, the United States Supreme Court held that in refusing to admit and give effect to the Connecticut court's decree in the Dresser case the Minnesota court had failed to obey the mandate of the Constitution requiring full faith and credit to be given the judicial proceedings of a sister state and for that error reversed the judgment. The court discussed at length the contention that the plaintiff below, Mrs. Ibs, had not been a party to the Connecticut proceedings nor had her husband, the insured. It pointed out reasons why members of a large and widely scattered class of persons having a common interest in the mortuary fund should be permitted to represent the class in an action involving a right common to all; that "it was for the court of the State where the company was chartered and where the fund was maintained to say what was the character of the members' interest;" that it was impossible for

the company to bring suit against 12,000 members living in different states or for all of such members to join in a suit to determine the questions involved; that the allegation in the Dresser petition that the suit was brought by the plaintiffs "in their own behalf and in behalf of all others similarly situated" would not by itself determine the character of the proceeding and in order that the decree should be binding on certificate holders not actually parties to the proceeding it had to appear that those suing had an interest that was in fact similar to that of the other members of the class, but that when such common interest did in fact exist it was proper that a "class suit" should be brought in a court of the state where the company was chartered and the mortuary fund was kept; and that "the decree in such a suit, brought  . . .  against the company by 30 certificate holders for 'the benefit of themselves and all others similarly situated,' would be binding upon all other certificate holders."

Answering the contention made in the Ibs case that the Connecticut decree determining the status and use to be made of the mortuary fund could not be offered in evidence in a suit on the policy of insurance because the action and the thing adjudged in the two cases were different, the court said, 237 U. S. 1. c. 673.:

"But the defendant's contention that the policy had lapsed, because of the failure of Ibs to pay the assessment, and the plaintiff's reply that the assessment was void because the Mortuary Fund was sufficient to meet Call 127, raised an issue as to the right of the Insurance Company to levy the assessment. On that issue the Connecticut decree was admissible, since it adjudged that the Company had the right to make advances to pay claims and could subsequently collect the amount of such claims by an assessment levied as in the present case. Its right so to do having been determined by a court of competent jurisdiction, the decree was binding between the parties or their privies in any subsequent case in which the same right was directly or collaterally involved. For *even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.'* [Southern Pacific Co. v. United States, 168 U. S. 48-49.] So also it was held in Forsyth v. Hammond (166 U. S. 518), that 'though the form and causes of action be different, a decision by a court of competent jurisdiction in respect to any essential fact or question in the one action is conclusive between the parties in all subsequent actions.' "

Barber v. Hartford Life Ins. Co., supra, was an action at law on an assessment insurance certificate or policy similar to that in the Ibs case. The suit was brought by the beneficiary after the death of the certificate holder. The company defended, as in the Ibs case, on

the ground that the certificate had lapsed and the insurance was for-
feited under the terms of the contract because the insured had failed
to pay an assessment (being the one next following that involved in
the Ibs case). In support of that defense and in answer to the plain-
tiff's contention that the assessment was illegal, for, among others,
reasons similar to those asserted in the Ibs case, the company offered
in evidence the Connecticut decree in the Dresser case above referred
to, which the trial court excluded. The plaintiff recovered and on
appeal to this court the judgment in her favor was affirmed. The
United States Supreme Court reversed the judgment on the ground
that the Missouri courts had not given full faith and credit to the
Connecticut decree. It followed the Ibs case and said that the plain-
tiff was bound by the Connecticut judgment in the Dresser case.
[Hartford Life Ins. Co. v. Barber, 245 U. S. 146.] It does not ap-
pear that Barber had been a party to the proceedings in the Dresser
case. See, also, Supreme Council of the Royal Arcanum v. Green,
237 U. S. 531, holding (quoting from the syllabus) that:

"A judgment rendered by a court of the State of incorporation
holding an amendment to the constitution and by-laws of a fraternal
and beneficiary corporation to be legal, amounted to a construction of
the charter by the courts of the State which the courts of another
State were bound to recognize under the full faith and credit clause
of the Federal Constitution."

The Royal Arcanum was a Massachusetts corporation. It issued
certain benefit certificates payable out of a fund provided by assess-
ments upon the members. Green had received such a certificate, issued
by a subordinate lodge in New York where he resided. The corpora-
tion had amended its by-laws and raised the assessment rates. Some
sixteen members of the association, holding certificates similar to
Green's, had sued the corporation in Massachusetts in their own be-
half and in behalf of all other certificate holders to vacate and set
aside the by-laws by which the rates had been increased on the ground
that the increase was *ultra vires* of the corporation and violative of
contract rights. The Massachusetts court, upon review of the nature
of the corporation, the character of the fund, the rights of the mem-
bers as evidenced by the certificates, the constitution and by-laws of
the corporation and the laws of the state applicable thereto, decided
that the increase complained of was valid, impaired no contract right
of the certificate holder and was entitled to be enforced. [Reynolds
v. Supreme Council, Royal Arcanum, 192 Mass. 150.] Later Green,
who evidently had not been a party to the Massachusetts suit, sued
in a New York court assailing the validity of the increase in assess-
ments on the ground that it was void as exceeding the powers of the
corporation and conflicting with his rights as a member of the cor-
poration and a certificate holder. He ultimately prevailed in the

682

State courts. The case reached the United States Supreme Court where it was held that the Massachusetts law governed and that the decision in the Reynolds case was entitled to full faith and credit by the New York courts, which had not been accorded to it, and reversed the judgment.

In view of the decisions of the United States Supreme Court referred to above, the conclusion appears to us inescapable that the decision in the Wall case, to which we are bound to give effect under the full faith and credit clause of the Federal Constitution, determines adversely to respondent his contention that the assessment he refused to pay was illegal or violative of his contract rights because levied upon the assessment members alone.

If the question were not thus concluded we think the same result would have to be declared. We do not understand respondent to deny the validity of the Iowa statutes pursuant to which defendant transformed itself from an assessment company into a level premium company or the validity of the proceedings by which the change was effected, or that, after the change, the defendant had the right to issue level premium policies and cease writing assessment insurance. In any event those questions were all fully considered and decided in the Wall case. It was there held that said statutes were constitutional and valid, that the reorganization had been legally accomplished, that the company had the right thereafter to cease writing assessment insurance and to issue level premium policies, and that such change in its organization and business did not violate any contract rights of assessment members. The holders of level premium policies are entitled to have their contracts carried out as made. Under those contracts the holders pay certain fixed premiums in consideration for which they are to receive the benefits provided in the policies. Those contracts and the law governing them do not provide that other or further payments may be demanded of the holders or that part of the consideration such holders pay for their insurance may be diverted by the company to the benefit of holders of assessment certificates. The level premium policies and the assessment certificates represent separate and distinct kinds of insurance. We think it clear that the company could not assess level premium policyholders or use money paid as premiums by them to pay death losses occurring among the assessment members without violating the obligation of its contracts with such level premium policyholders. But we shall not further extend the discussion of this point. We consider the question concluded by the decision in the Wall case. The point is ruled against respondent.

Of the question of estoppel.

Plaintiff contends that by the letter written to him December 8, 1911, defendant construed his contract to mean and in effect as-

sured him that assessment members would not be put in a class by themselves for assessment purposes but that death losses among such members would be apportioned "throughout the entire membership," including level premium policyholders, and that he relied and acted thereon and that defendant is now estopped from making assessments otherwise than as thus indicated. Defendant in its answer pleaded that if such letter was written, which it denied generally, the same was without its authority and that it was *ultra vires* the corporation. The part of the letter relating to assessments reads as follows:

"Your letter of Dec. 2nd, is at hand. The recent change in plan relates more especially to business to be written in the future rather than to the business now on the books. All contracts heretofore issued will be carried to maturity in accordance with their terms.

"The present members are not to be put in a class by themselves, but will remain part of a large and growing company and will share in the benefit derived from the admission of new business.

"Death losses occurring throughout the entire body of the lives insured will be equitably apportioned, so that each person, whether insured on the assessment or legal reserve basis, will bear his just share of the total death losses of the Company.

"The Bankers Life will have two classes of members, one carrying insurance on the assessment or natural premium plan, with the cost not fixed, and the other carrying insurance on the legal reserve basis with fixed premium. This will in no way prevent the equitable apportioning of the total death losses throughout the entire membership of the two classes combined."

Except as it may be construed as an expression of opinion as to the legal effect of the reorganization upon the previously existing assessment contracts the letter consists mainly, if not entirely, of statements in the nature of promises or predictions for the future rather than statements of existing or past facts. In its statements relative to assessments it is rather vague. It promises that death losses throughout the entire body will be "equitably apportioned," so that each person will bear "'his just share" of the total losses, but without specifying what is meant by equitable apportionment and a just share of the total losses. The company attempted to and did, at least until the decision of the Wall case, make what its evidence indicates it considered an equitable apportionment by crediting to the emergency fund a portion of the money properly belonging to the level premium policyholders but, as above stated, the sums so used did not amount to assessments such as were levied upon the assessment members and were not levied as assessments. But treating the letter as calculated to be and being understood by plaintiff as a statement that level premium policyholders would be assessed or would pay proportionately with assessment members to meet death

losses among the latter class it hardly amounts to more than a promise of what would be done in the future or an expression of opinion relative to the meaning of plaintiff's contract as affected by the re-organization. In 21 Corpus Juris, page 1142, section 144, it is said:

"The doctrine of estoppel by representation is ordinarily applicable only to representations as to facts either past or present, and not to promises concerning the future which, if binding at all, must be binding as contracts."

Section 145 states the exception to the rule to be where the statement "relates to an intended abandonment of an existing right, and is made to influence others who have in fact been influenced by it." [See, also, 2 Herman on Estoppel, sec. 778.] The exception does not apply here. To refrain from assessing the level premium policy-holders was not merely a *right* which the company could abandon. The obligation of the level premium contracts forbade such assessment.

In 21 Corpus Juris, page 1147, we read:

"While there is some authority to the contrary, it is very generally held that an admission, in order to constitute an estoppel, must relate to a matter of fact, and a person will not be estopped by an admission as to the law."

The principles quoted above were applied in Thomas v. Modern Woodmen of America, 218 Mo. App. 10, 260 S. W. 552, in which a representative of the defendant had told the plaintiff that it would be all right for him to engage in a certain prohibited occupation and that if he did so and was not expelled from the order and was killed while so engaged the benefit certificate would be paid. The representation was held insufficient to show estoppel against the defendant. The certificate holder knew that by the terms of his certificate the defendant association was exempt from liability for death occurring as a result of engaging in such prohibited occupation. On certiorari this court refused to quash the opinion of the Court of Appeals, holding that it did not conflict with prior decisions of this court. [State ex rel. Thomas v. Trimble, 303 Mo. 266, 259 S. W. 1052.] In the latter case this court said; 303 Mo. l. c. 283, 259 S. W. l. c. 1057:

"We certainly have never held that a statement made by a general agent of an insurance company, to one of its policyholders, express-ing an opinion as to the legal effect of the provisions of the latter's policy, was, absent fraud, binding on the company, either as an admission or on the ground of estoppel."

Respondent, however, does not seem to treat the statements contained in the letter as merely representations of what the company expected to do in the future or as merely an expression of opinion as to the meaning and effect of his original contract, but rather to ascribe to said statements, when taken in connection with his accept-

ance thereof and reliance thereon, the effect of creating new or additional contractual obligations on the part of the company. And he insists that even though such agreement was *ultra vires* the corporation that defense is not open to defendant since he had accepted and acted upon its representations. There is force in such argument where the contract in question is one merely *in excess* of the corporation's charter powers and has been performed by the other party. [First National Bank v. Guardian Trust Co., 187 Mo. 494, 86 S. W. 109; Cass County v. Merc. Town Mut. Ins. Co., 188 Mo. 1, 86 S. W. 237; McCornick & Co. v. Citizens Bank, 304 Mo. 270, 263 S. W. 152.] But where the contract in question is one that is *expressly prohibited* by the corporation's charter or by law a different rule prevails. We think the cases last above cited (which are relied upon by respondent) recognize the distinction. In those cases the defendants were held estopped from asserting the defense of *ultra vires*, but on facts which clearly distinguish them from the instant case. The distinction is thus pointed out in Smith, Receiver, v. Richardson, 77 Mo. App. 422, l. c. 430:

"In determining the obligation of a private corporation for acts commonly termed *ultra vires*, an important distinction, noted in every well reasoned case, is sometimes overlooked. No corporation can bind itself or its stockholders by a contract *expressly* prohibited by its charter, by a statute, or by the general law. Such contracts are strictly *ultra vires* and create no obligation as far as they are executory, although the consideration therefor may have been received and enjoyed by the corporation. On the other hand, an act or contract merely in excess of the power granted to corporations, but which is not expressly forbidden either by its charter or the general law of the State, although lacking affirmative authority for its performance on account of the silence, on that subject, of its charter or the general law, may yet, if the contract has been executed by the other party and its consideration received by the corporation, bind the latter on the principle of estoppel so that it could not be annulled by the corporation without a return of the consideration received by it. Contracts of this kind are not in the strict sense of the term *ultra vires*. They are only unauthorized acts of corporations, and not being void, but only voidable, the option to avoid them is lost if they have been wholly executed or executed by the adverse party. [Thompson Con., sec. 6016 *et seq.*] The reason a contract strictly *ultra vires* as above defined, can never be enforced while anything remains to be done thereunder, is that a corporation deriving all its power to act from its constraining articles and the general law can make no lawful contract in violation of the positive edicts of either. On the other hand, the estoppel of a corporation to annul an executed agreement or one whose consideration it has received (which though unauthorized, is

not prohibited by law or its charter), is grounded on the idea of preventing fraud by the corporation on the party whom it had misled into the performance of the agreement. A careful view of the controlling decisions will fully sustain this distinction between the enforcible and the nonenforcible acts of private corporations."

Manifestly there is no contract requiring the level premium policyholders to pay an assessment or any part of the death losses for those holding assessment certificates under the old plan. There is no evidence suggesting that any of them have agreed or consented to be thus assessed or to contribute to such death losses. The company is bound by its charter and the law to carry out the level premium contracts. As said in the Wall case, discussing this question: "There is the prohibition against the impairment of the obligation created by the agreement giving rise to the level premium or legal reserve policy, the same as that protecting any other contractual undertaking. This is self-evident." The agreement or undertaking, call it what you will, which plaintiff contends the defendant assumed by said letter and his acceptance was one not merely in excess of its charter powers but prohibited by its amended charter and the law, because it could not carry out that undertaking without violating the obligation of its contracts with the level premium policyholders.

This subject received full consideration in the Wall case, in which the petitioners and interveners urged a similar contention based on a circular letter written by the company October 28, 1911, to all certificate holders, including respondent. That letter contained representations similar to those in the letter of December 8, 1911, to respondent here. The question of estoppel was ruled against the petitioners and interveners in the Wall case. Without considering whether or not that part of the Wall decision is binding upon us, we regard it as persuasive because we think it is based on sound reason. In our opinion, upon the record presented, this point also must be ruled against respondent. We think this conclusion finds support in State ex rel. Thomas v. Trimble, supra. [See, also, Delaney v. Grand Lodge A. O. U. W. (Mass.), 138 N. E. 918; Illinois Life Ins. Co. v. Tully (C. C. A.), 174 Fed. 355, 365.]

Respondent filed herein a motion to dismiss the appeal on the ground that appellant's abstract of the record contained so much matter unnecessary to a proper understanding of the issues as to constitute a violation of our rules. The abstract is voluminous. So was the record below. While the abstract might well enough have been somewhat abbreviated we do not think it violates our rules to such extent as to justify dismissal of the appeal. We have in effect overruled the motion to dismiss by considering the case on the merits. Let it be formally overruled.

The judgment of the circuit court is reversed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur, except *Ellison, P. J.,* absent.